**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

Robert M. MORRISON, Michael Anderson, James D. Walton, Sean Foley, and Jose Andrini–Varga, Defendants–Appellants.

**Nos. 89–2284, 89–2329, 89–3011, 89–3130 and 91–1164.**

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1991.

Decided Oct. 10, 1991.

As Amended Dec. 2, 1991.

486

488

Patricia J. Gorence, Paul Kanter (argued), Asst. U.S. Attys., Office of the U.S. Atty., Milwaukee, Wis., for U.S.

Kenneth L. Cunniff (argued), Chicago, Ill., for Robert M. Morrison.

Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, Wis., Robert E. Shumaker (argued), Ross & Stevens, Madison, Wis., for James D. Walton.

Ronald L. Walters (argued), Chicago, Ill., for Michael Anderson.

Robert A. Adman (argued), Appleton, Wis., for Sean Foley.

Jeffrey B. Steinback, Geena D. Cohen, Leonard Goodman (argued), Genson, Steinback & Gillespie, Chicago, Ill., for Jose Andrini–Varga.

Before CUDAHY, COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Defendants were convicted of a variety of controlled substance offenses stemming from their involvement in a drug ring that imported and distributed cocaine and marijuana. They appeal their convictions and sentences on a variety of grounds. We affirm their convictions, but vacate the sentences of three of the defendants—Anderson, Foley, and Walton—and remand for resentencing.

The drug smuggling operation in which the defendants participated was run out of Gonzi Marine, a marina in San Juan, Puerto Rico. In its early years of business, between 1983 and 1985, the drug ring imported and distributed cocaine. Between 1986 and 1988, marijuana became its product of choice. During both periods, the group's method of operation remained the same. Members of the drug ring would travel to the country of supply—Panama for cocaine, Jamaica for marijuana—purchase their product, fly it by small plane to the coast of Puerto Rico, and drop it into the

water near the deserted beaches of small islands off the coast. Other members of the ring would pick up the shipment by boat and transport it to Gonzi Marine and other points in Puerto Rico, where it was packaged and shipped in sealed coffee cans to Chicago, Milwaukee, and points north.

A total of 37 defendants were indicted in connection with this operation. The indictment charged the defendants with importing cocaine and marijuana and conspiring both to import and distribute cocaine and marijuana. Many of those accused pled guilty; those who did not were tried in three separate trials, including the prosecution giving rise to this appeal. A jury convicted defendant Morrison of both conspiracy to import cocaine and conspiracy to import marijuana as well as three counts of importing marijuana and one count of importing cocaine. Defendant Walton was convicted of conspiring to import marijuana, and defendant Anderson was convicted of conspiring to distribute cocaine and to import marijuana. Defendant Foley was convicted of conspiring to distribute and to import marijuana, as well as three counts of importing marijuana. Finally, Andrini–Varga was convicted of conspiring to import marijuana and three counts of importing marijuana. As necessary, we will discuss below the details of the smuggling operations and the defendants' participation therein. Defendants raise a host of challenges to their convictions and sentences. We address the bulk of them in our discussion; the remainder are palpably without merit.

## I. ANDRINI–VARGA

### A.

■ Andrini–Varga raises a number of claims relating to the venue of his trial. Though the majority of the group's activities took place in Puerto Rico, the defendants were tried in Milwaukee. This prompted Andrini–Varga to file a motion pursuant to Federal Rule of Criminal Procedure 21(b) requesting that his trial be transferred to Puerto Rico. The district court denied the motion and Andrini–Varga contests that decision on appeal. Rule 21(b) states that a district court may effect transfer of venue (as to particular defendants or as to particular counts of an indictment) "[f]or the convenience of the parties and witnesses, and in the interest of justice." We defer to the district court's resolution of Rule 21(b) motions, and will reverse its decision only if it amounts to an abuse of discretion. *United States v. Zylstra*, 713 F.2d 1332, 1336 (7th Cir.1983). "The facts must compel and not merely support venue transfer before an abuse of discretion will be found by an appellate court." *United States v. Hunter*, 672 F.2d 815, 816 (10th Cir.1982). Andrini–Varga asserts that the balance of relevant factors, which were set out in *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243–44, 84 S.Ct. 769, 771, 11 L.Ed.2d 674 (1964),[1] militate in favor of his request for a change of venue: he makes his home in Puerto Rico, all of his witnesses resided in Puerto Rico, and his participation in the drug ring's import operations occurred solely in Puerto Rico. Weighed against these factors, however, was the fact that Andrini–Varga was charged with conspiring to violate the drug laws and tried with five co-defendants. Because of the number of defendants involved, to have transferred Andrini–Varga's trial—essentially granting him a severance—would have given rise to a "multiplication of litigation" resulting in great inconvenience to the witnesses involved as well as considerable expense to the government. *Zylstra*, 713 F.2d at

---

**1.** The Court in *Platt* suggested the relevance of the following factors: the "(1) location of [the] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer." 376 U.S. at 244–45, 84 S.Ct. at 771 (footnote omitted). "No one of these considerations is dispositive.... 'It remains for the [district court] to try to strike a balance and determine which factors are of greatest importance.'" *United States v. Maldonado–Rivera*, 922 F.2d 934, 966 (2d Cir.1990) (quoting *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990)).

**490**

1336. We recognize that the proper venue for criminal actions is normally "in [the] district in which the offense was committed," *see* Fed.R.Crim.P. 18, and that the majority of the conspiracy's activities took place in Puerto Rico. Nevertheless, given the countervailing considerations we have discussed above, and the fact that the drug ring did indeed distribute some of the drugs it imported in Milwaukee, we cannot say that the facts "compelled" the transfer of Andrini–Varga's trial. The district court did not abuse its discretion in denying his Rule 21(b) motion.

### B.

 Andrini–Varga also argues that the district court erred in denying his motion requesting that his Wisconsin attorney be allowed to travel to Puerto Rico at government expense to interview potential witnesses, take their depositions, and investigate the scene of the drug ring's alleged operations. Under Rule 15 of the Federal Rules of Criminal Procedure, an indigent defendant may petition the court for the payment of the cost of deposing witnesses (including attorney travel costs) when "exceptional circumstances" warrant the preservation of the testimony of prospective witnesses for use at trial. And under 18 U.S.C. § 3006A(e)(1), "counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an *ex parte* application." Upon a finding that the requested services are "necessary" and that the defendant is indigent, § 3006A(e)(1) directs courts to authorize such expenditures. At least one court has read this subsection to apply not only to requests by counsel for investigators, but to the travel reimbursement requests of attorneys embarking on their own investigations on behalf of their clients. *See United States v. Mateos–Sanchez*, 864 F.2d 232, 239 (1st Cir.1988).

Under § 3006A(e)(1), investigative expenditures on behalf of indigent defendants are authorized to the extent they are "necessary for an adequate defense." The decision to grant or deny such requests is committed to the discretion of the trial court and will be overturned only for abuse of discretion. *United States v. Goodwin*, 770 F.2d 631, 635 (7th Cir.1985); *United States v. Alden*, 767 F.2d 314, 319 (7th Cir.1984). Andrini–Varga contends that the district court erred in refusing to authorize his attorney to travel to Puerto Rico "to interview potential witnesses." We are perplexed by this argument. While the district court denied Andrini–Varga's request for attorney travel expense reimbursement, it did indeed authorize the expenditure of $3,000 for investigative services to be used in the preparation of his defense. Andrini–Varga makes no mention of this fact in his brief on appeal. In light of the fact that Andrini–Varga was granted a $3,000 investigation budget, and in the absence of any argument on his part that the authorized sums were insufficient to mount an adequate defense, we cannot say that the district court abused its discretion in not authorizing additional investigative expenditures beyond that sum.

With respect to that portion of his motion implicating Rule 15, Andrini–Varga was required to demonstrate the existence of "exceptional circumstances" warranting the preservation of the testimony of prospective witnesses for use at trial. He failed to do so. His motion stated only that "it is possible that a number of depositions will need to be taken in regard to the preparation of this defendant's defense." This is not the stuff of "exceptional circumstances"; a showing of exceptional circumstances must be considerably more concrete and particularized than mere speculation about the possible need for depositions in the future. Faced only with Andrini–Varga's single sentence request, the district court (through Magistrate Bittner) did not err in denying the motion to the extent that it rested on Rule 15. We recognize that the ambiguous nature of Andrini–Varga's request may have been due to the fact that, at the time of the motion, his attorney was in the early stages of preparing a defense. We note that Andrini–Varga's Rule 15 motion was denied without prejudice and could have been renewed at a later date when he had collected more informa-

tion relevant to his defense and the witnesses upon whom he wished to rely.

### C.

■■■ Andrini–Varga also faults the district court for denying his request pursuant to Rule 17 of the Federal Rules of Criminal Procedure to subpoena—at the government's expense—sixty witnesses to appear to testify at his trial.[2] Andrini–Varga asserted generally that these sixty witnesses were relevant to his alibi defense, but did not relate the substance of their anticipated testimony or otherwise explain the importance of each. The district court ruled that Andrini–Varga's request was excessive and insufficiently specific and denied it *in toto;* the judge invited the defendant to "submit a more reasonable request indicating precisely the nature of the testimony that the witnesses would offer and what specific testimony by government witnesses would be contradicted by any of the prospective defense witnesses." Andrini–Varga never renewed his motion.

He now argues that he need not have been more specific in explaining the relevance of each witness on his list. His motion breaks down his sixty person witness list into smaller lists, each relevant to particular places and time periods. For example, at one point, Andrini–Varga lists eight people who could confirm his presence in New York City and Florida during a one-week period when the government alleged that he was elsewhere. He did not, however, explain where he saw or interacted with his alibi witnesses and whether they were duplicative; apparently this is the type of specificity the district court desired. We do not think the district court asked too much of Andrini–Varga. Under Rule 17, a defendant must show that the presence of a witness to be subpoenaed at government expense is "necessary to an adequate defense." Andrini–Varga, then, had a burden to carry; to be sure, it was not an especially heavy one, but he had to establish the *necessity*—which seems to us to be more than the mere relevance—of each witness' testimony. Other courts have indeed required the kind of particularity that the district judge here demanded, *see, e.g., United States v. Espinoza*, 641 F.2d 153, 159 (4th Cir.1981), especially when it appears, as here, that the testimony of some of the witnesses for whom subpoenas were requested would be cumulative, and hence of diminishing marginal value. *See United States v. Solina*, 733 F.2d 1208, 1213 (7th Cir.1984); *United States v. Garza*, 664 F.2d 135, 141 (7th Cir.1981). In sum, we do not believe that the district judge abused his "wide discretion," *Garza*, 664 F.2d at 141, in asking Andrini–Varga to resubmit a more detailed Rule 17 request.

### D.

■■■ Andrini–Varga also challenges the sufficiency of the evidence supporting his conviction for conspiring to import marijuana. "To prove that a defendant was a member of a conspiracy the government must present sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal purpose." *United States v. Auerbach*, 913 F.2d 407, 414–15 (7th Cir.1990); *see also United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991). To know of a conspiracy, of course, is to know of an agreement between conspirators to achieve a criminal purpose. *See Townsend*, 924 F.2d at 1390–92. In evaluating whether the government met its burden of proof, we will view the evidence in a light most favorable to the government, and will reverse a conviction only if no rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. *See*

---

**2.** In relevant part, Rule 17 states that:

The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense.... [T]he costs incurred by the process and the fees of the witness so subpoenaed shall be paid [by the government].

*United States v. Atterson,* 926 F.2d 649, 655 (7th Cir.1991).

At trial, a number of Andrini–Varga's co-conspirators—Dennis McCarthy, Randy Friedl, Kevin Cleary, and James Brandt—testified that on four different occasions Andrini–Varga participated in the pick up of air-dropped marijuana bundles by boat, that he was the owner of Gonzi Marine, the establishment where the conspirators met before and after air-drops and pick ups and where marijuana was sometimes stored and packaged for shipment, and that he participated in the packaging of marijuana for shipment to the United States mainland on at least two occasions. In his brief, Andrini–Varga denies little of this; he claims, however, that the government has failed to prove what he considers a critical element of the crime of conspiracy: that he was involved in the *planning* of—rather than in the mere participation in—the smuggling venture. Absent such evidence of planning, he argues, the government has not proven his "specific intent to achieve the objective of the conspiracy." We disagree. Evidence of planning is not a critical element of the crime of conspiracy, agreement is. Planning the crime is simply one way to help bring about the object of the conspiracy; executing the plan is another. Andrini–Varga's extensive participation in the drug ring's pick-up and packaging operation is more than sufficient to give rise to the inference that he agreed with his co-conspirators to import marijuana into the United States and to demonstrate that he joined with them to further that end.

### E.

Andrini–Varga's final argument on appeal is that the district court erred in applying the Sentencing Guidelines to his conviction for conspiring to import marijuana. He contends that the Guidelines are inapplicable because all of the marijuana imported by the conspiracy came into the country before November 1, 1987, the Guidelines' effective date. Andrini–Varga's assertion of fact is correct, though the legal conclusion he draws from it is not.

The conspiracy's only activities after November 1, 1987, consisted of two *failed* attempts to air-drop marijuana. In January of 1988, the drug ring lost 3,000 pounds of marijuana at sea in two unsuccessful smuggling runs. Andrini–Varga argues that these attempts ought not to be considered as part of the conspiracy's operations. We disagree. A failed air-drop may be insufficient to support a substantive conviction for importing marijuana, but it is most certainly an act in furtherance of the importation conspiracy. *See* U.S.S.G. § 1B1.3, comment. (n. 1) ("conduct ... in furtherance of the execution of the jointly-undertaken criminal activity" should be considered in sentencing under the guidelines); *see also* § 2D1.4 ("If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed."). The conspiracy's actionable conduct, then, straddles the operational date of the Guidelines. It is well settled that the Guidelines indeed apply to "convictions for criminal conduct that began prior to the effective date of the Guidelines and continued after that date." *United States v. Osborne,* 931 F.2d 1139, 1144 (7th Cir.1991); *see also United States v. Fazio,* 914 F.2d 950, 959 (7th Cir.1990). Thus, the district court did not err in sentencing Andrini–Varga under the Guidelines.

## II. MICHAEL MORRISON

### A.

Morrison claims on appeal that the district court erred in denying his motion for a mistrial following the testimony of Donald Lincoln, a special agent of the DEA. Lincoln testified that Panamanian Defense Force officials told him that they had identified Morrison as a passenger in a small plane that was later suspected of containing cocaine bound for Puerto Rico. The district court sustained Morrison's objection to this testimony on hearsay grounds. Morrison then moved for a mistrial. The court took the motion under advisement, and denied it at the conclusion

of the government's case. Andrini–Varga now contends that Lincoln's testimony was so exceedingly prejudicial that the district court erred in denying his mistrial motion.

We review the district court's ruling on Morrison's mistrial motion under an abuse of discretion standard, *United States v. Ashford*, 924 F.2d 1416, 1423 (7th Cir.1991), and will reverse its ruling only if the circumstances "compel a district court to grant a mistrial." *United States v. Kwiat*, 817 F.2d 440, 446 (7th Cir.), *cert. denied*, 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987). In denying Morrison's motion, the court noted both that it had instructed the jury to disregard Lincoln's testimony, and that the substance of Lincoln's stricken testimony—that Morrison helped fly cocaine from Panama to Puerto Rico—was cumulative of testimony offered by other government witnesses. (We detail this evidence below in our treatment of Morrison's sufficiency challenge.) Upon reviewing the record, we conclude that the district court correctly determined that the prejudice inuring to Morrison from Lincoln's stricken statement was *de minimis* given the other evidence presented by the government tying him to the cocaine flight.

### B.

■■■■ Morrison also contends that the government failed to present evidence sufficient to prove him guilty of importing cocaine and conspiring to import cocaine. This claim is meritless. A number of individuals identified Morrison as a passenger on a flight, originating in Panama, that dropped a 250 kilogram package of cocaine in waters off the coast of Puerto Rico. Dennis McCarthy, who together with the conspiracy's acknowledged kingpin, John Roubas, played a significant role in coordinating the activities of the drug ring, and who, after being apprehended, elected to become a government witness, testified that Morrison was on the plane assisting with the air-drop. Morrison assails the credibility of McCarthy, the beneficiary of what he terms a "generous" plea agreement, but in evaluating Morrison's sufficiency challenges, we may not reassess the

credibility of the government's witnesses. "The jury decides they are credible when it chooses to convict." *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir.1991); *see also United States v. Klein*, 910 F.2d 1533, 1538 (7th Cir.1990). Another co-conspirator, Kevin Cleary, also testified that he was present during a conversation in which Morrison related his involvement in the cocaine air-drop escapade, and another conversation in which Henry Pallais, the plane's other passenger, recounted a similar tale about his cocaine flight with Morrison. Government agents also introduced evidence linking Morrison to the drug flight. Customs inspector Charles Williamson testified that Morrison (or someone using Morrison's name) had registered with ground control authorities as the pilot of a small plane which landed in San Juan, Puerto Rico, around the time the cocaine was air-dropped. Agent Lincoln testified that a small plane with the same tail number had been in Panama shortly before the flight. Another agent testified that stamps in Morrison's passport indicated that he had been in Panama in the days preceding the flight. Finally, the testimony of co-conspirators placed Morrison in the vehicle used to transport the cocaine bundle to Gonzi Marine for packaging, and at Gonzi Marine while the packaging was taking place. We believe this evidence is sufficient to support an inference that Morrison knew of and joined a cocaine importation conspiracy and that he actually participated in the importation of cocaine.

### C.

■■■■ Morrison next claims that the government improperly charged him with both conspiring to import cocaine and conspiring to import marijuana. He contends that the evidence at trial established that there was "at most, a single conspiracy," and that the government impermissibly parsed the conspiracy to obtain two distinct convictions for the drug ring's marijuana and cocaine importation activities. The question, as we have previously put it, is whether a "conspiracy has been subdivided arbitrarily, resulting in multiple indict-

ments for a single illegal agreement." *United States v. Castro,* 629 F.2d 456, 461 (7th Cir.1980); *see also United States v. Powell,* 894 F.2d 895, 898 (7th Cir.1990). In determining whether a single conspiracy has been arbitrarily and improperly severed, we look to the commonality of co-conspirators, situs, and overt acts between the two conspiracies and to "whether the two conspiracies depend upon each other for success." *United States v. Cerro,* 775 F.2d 908, 913 (7th Cir.1985) (quoting *Castro,* 629 F.2d at 461.) We note the rock and the hard place between which we place the government if we are overly exacting in applying this analysis: on the one hand, under *Castro* and its progeny, the government may not charge multiplicitous conspiracies; on the other, we have not infrequently discouraged the government from indicting too many defendants under the skimpy guise of a single overarching conspiracy. *See Townsend,* 924 F.2d at 1390–95; *United States v. Pallais,* 921 F.2d 684, 687 (7th Cir.1990); *United States v. Napue,* 834 F.2d 1311, 1333 (7th Cir.1987).

· Although there is considerable overlap between the cocaine and marijuana importation conspiracies—both conspiracies used Gonzi Marine, both utilized almost identical air-drop, pick-up and packaging operations, and both were organized and led by the same two people—we do not believe the government erred in separately indicting Morrison for his involvement in each. The drug ring appears to have engaged in cocaine importation and distribution primarily during the period 1983–85, whereas the vast majority of its marijuana importation activities took place in 1986 and 1987. Moreover, the organization's cocaine operations were limited roughly to a half-dozen individuals, whereas the marijuana conspiracy's operations involved an additional half-dozen or so co-conspirators who, so far as the record reflects, had little or no contact with cocaine-related activities and transactions. Had the government charged a single conspiracy, the latter group would have rightly protested that there were two conspiracies rather than one. We find apt this court's response to a similar challenge raised by Henry Pallais, a co-conspirator of Morrison's, who, in a separate prosecution, was also charged with involvement in both cocaine and marijuana conspiracies:

> A legitimate business enterprise can have many divisions, programs, activities, contracts; they are not all a single agreement just because a handful of top officers is in charge of the entire firm and some of the lower level employees may work on more than one program or contract. The same is true with a criminal enterprise. The jury properly found two conspiracies.

*Pallais,* 921 F.2d at 687.

### D.

▮▮▮▮▮ As noted above in II.B., Dennis McCarthy testified against Morrison. During the course of trial, Morrison discovered that DEA agent Jeanne Tasch, who had interviewed McCarthy before trial, had taken notes of the interview. Upon learning of this, Morrison immediately moved for a mistrial, arguing that the prosecution's failure to disclose the evidence of the notes and to turn them over to the defense was in violation of the Jencks Act, 18 U.S.C. § 3500, and was unduly prejudicial. The district court denied Morrison's motion, and he now appeals that ruling.

Under the Jencks Act, the government must, upon motion of the defense, disclose to the defense any statements made by government witnesses prior to their testimony at trial. By statute, such disclosure need only take place after a government witness has testified on direct examination. According to the local "open file" practice of the Eastern District of Wisconsin, however, the government was obligated to turn over Tasch's notes, if they qualified as statements, before trial. Only certain types of pretrial "statements" must be produced by the government pursuant to § 3500: (1) "written statement[s] made by [a] witness and signed or otherwise adopted or approved by him"; (2) "stenographic, mechanical, electrical or other recording[s]" which are "substantially verbatim recital[s]" of oral statements made by witnesses; and (3) statements "however taken or recorded" made by a witness to a

grand jury. 18 U.S.C. § 3500(e)(1)–(3). These definitions were "intended by Congress to describe material that could reliably and fairly be used to impeach the testimony of a witness." *United States v. Allen,* 798 F.2d 985, 994 (7th Cir.1986). Agent notes and summaries of witness statements that are neither adopted by the witness nor substantial verbatim recitals of what the witness said are deemed unreliable under the statute and need not be produced. *See, e.g., id.; United States v. Gonzalez–Sanchez,* 825 F.2d 572, 586–87 (1st Cir.1987); *United States v. Griffin,* 659 F.2d 932, 936–37 (9th Cir.1981).

Agent Tasch's notes were neither signed nor adopted by McCarthy; the only question is whether they were "substantially verbatim recitals of McCarthy's oral statements" transcribed in some reliable "stenographic, mechanical, electrical or other" fashion. At trial, the government argued that this was not the appropriate inquiry; it maintained that so long as a subsequent DEA report summarizing McCarthy's statements had been released to the defendants, it was not obligated to release Tasch's rough notes, upon which the released report was based. We find no support for this position. If Tasch's notes were substantially verbatim recitals of McCarthy's statements, then the government was obligated to turn them over. *See, e.g., United States v. Lonardo,* 350 F.2d 523, 527 (6th Cir.1965); *Williams v. United States,* 338 F.2d 286, 288 (D.C.Cir. 1964). Of course, if Tasch's rough notes were substantially the same as the report released to the defense, the government would have a good argument that any error committed by the district court in failing to compel the production of the notes was harmless. *See United States v. Tashjian,* 660 F.2d 829, 839 (1st Cir.1981). From the record, we cannot tell if this is so.

Early in the course of trial, Magistrate Bittner ruled without explanation that Tasch's notes and the interview notes of other government agents did not qualify as statements whose production was compelled under the Jencks Act. The district court, in turn, relied on Magistrate Bittner's ruling in denying defendants' motion to compel production of Tasch's notes. We take the magistrate's decision to mean that the notes were not "substantial verbatim recitals" of McCarthy's oral statements, as the other possible definitions of "statement" are clearly inapplicable to the facts before us.

Tasch's testimony suggests that the court's ruling was correct. She indicated that she had "several pages" of notes from her interview with McCarthy. Her report digesting McCarthy's interview was 37 pages long. This leads us to believe that Tasch's notes could not have been substantially verbatim recitals of McCarthy's interview and thus need not have been produced. Though they challenge the district court's ruling, neither Morrison nor Michael Anderson (who also challenges the government failure to produce Tasch's notes, *see* III.B. below) have made arguments or presented evidence that suggests otherwise. We conclude that the district court did not abuse its discretion in ruling that the government's failure to produce Tasch's notes did not warrant the declaration of a mistrial.

## III. MICHAEL ANDERSON

### A.

Anderson reiterates Morrison's last two claims on appeal. For the reasons detailed in II.C. and II.D., these arguments fail.

### B.

 Anderson also challenges the district court's Sentencing Guidelines calculations. Based on evidence presented by the government, the district court determined that prior convictions placed Anderson in criminal history category II of the Guidelines. The court ruled, however, that an upward departure, shifting Anderson to criminal history category VI was appropriate, because one of the prior convictions contributing to Anderson's criminal history score was for a brutal, execution-style murder. Criminal history category II, determined the court, "seriously underestimated" the severity of this crime. (In category II, Anderson's sen-

tencing exposure was 168–210 months; in category VI, it was 262–327 months.) Anderson challenges the propriety of this significant enhancement.

The Sentencing Guidelines allow the district court to depart upward in calculating a defendant's criminal history score when "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct." § 4A1.3. In reviewing a district court's decision to depart we must determine first whether the stated grounds for departure are legitimate and then whether the degree of departure was reasonable. The former inquiry is legal, and hence *de novo* in nature, whereas "we will give considerable leeway to a sentencing court's determination" in considering whether the degree of departure was appropriate. *United States v. Williams*, 901 F.2d 1394, 1396–97 (7th Cir. 1990).

We turn to the first prong of the inquiry—whether the very nature of Anderson's prior criminal conviction was legitimate reason for the district court's upward departure. Section 4A1.3 provides a non-exclusive list of situations where an upward departure may be warranted because "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct." The list's examples are all of a particular type: each suggests that an upward departure may be warranted when the defendant has committed crimes or conduct that the criminal history calculation instructions, *see* § 4A1.1–2, fail specifically to consider. *See, e.g.*, § 4A1.3(a) (foreign convictions); § 4A1.3(b) (consolidated sentence that is the consequence of a *series* of serious offenses should be weighted more heavily than other sentences for single offenses); § 4A1.3(c) (misconduct established by civil or administrative adjudication); § 4A1.3(e) (prior criminal conduct not resulting in a criminal conviction). In essence, § 4A1.3 is a backstop, designed to ensure that relevant conduct does not fall through unintended gaps in the Commission's broadly written calculation instructions.

The district court's departure in this case was of a completely different kind than the examples set out above. The Sentencing Commission did not neglect to award criminal history points for murder; to the contrary, Anderson was assigned criminal history points for his conviction as mandated by § 4A1.1. The district court simply believed that the Guidelines did not impute to Anderson *sufficient* criminal history points for his heinous crime. The court reasoned that by awarding a defendant three criminal history points for any offense resulting in a sentence of imprisonment exceeding one year and one month, § 4A1.1 inexplicably weighted murder no more than non-violent crimes such as forgery. We believe the district court erred in departing upward for this reason. As we suggest above, the examples set out in § 4A1.3 speak to a very different purpose behind the Guideline than the one to which it was put by the district court. The list is not intended to be exhaustive, but the principle of *ejusdem generis* nevertheless counsels that we be hesitant in allowing interpretations of § 4A1.3 that wander far afield of the examples contained therein. We are inclined to agree with the district court that the practice of weighing identically all prior sentences of a length greater than one year is somewhat indiscriminate, but to allow upward departures on the basis of the nature of a considered offense would render that very choice meaningless. The Commission consciously chose to award defendants three criminal history points for every conviction of greater than one year, regardless of the nature of the underlying offense conduct. *See* § 4A1.1. To sanction the district court's upward departure would fly in the face of that choice, and invite sentencing courts to create their own weighing schemes for prior criminal convictions. However appalled we are by Anderson's criminal past, and however much we might believe that the Guidelines ought to be more discerning about the nature of a defendant's criminal past, we cannot find support for the district court's upward departure in the Guidelines.

## C.

■ Anderson also contends that government agents engaged in misconduct by improperly preparing a witness before trial. He charges that DEA agent Tasch approached a sequestered witness, Michael Doyle, before Doyle was to testify at trial against Anderson, and warned him to be careful in identifying Anderson because two previous government witnesses had already misidentified Anderson. Morrison also alleges that IRS agent Larry Kaiser showed Doyle a photograph of Anderson to ensure that Doyle would not be added to the list of government witnesses who botched their identifications of Anderson. These allegations are very serious indeed, and, if true, detail identification procedures which may violate due process by virtue of their impermissibly suggestive nature. *See Manson v. Brathwaite*, 432 U.S. 98, 109–114, 97 S.Ct. 2243, 2250–53, 53 L.Ed.2d 140 (1977); *Simmons v. United States*, 390 U.S. 377, 383–84, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 300, 87 S.Ct. 1967, 1971, 18 L.Ed.2d 1199 (1967).

The problem with Anderson's allegations is that they border on misrepresentation of the record. It is true that Tasch met with Doyle on the night prior to his testimony, and that in the course of reviewing his upcoming testimony, explained to him that Anderson had been previously misidentified. It is emphatically not the case, however, as Anderson's brief implies, that Doyle was shown a photograph of Anderson that same night. During the district court's inquiry into the alleged misconduct, Doyle testified that he was not shown a photograph or given a description of Anderson. IRS agent Kaiser did show Doyle a picture of Anderson, but that identification occurred sometime in 1988, during the course of the government's investigation, months before Doyle's testimony in April of 1989. Anderson's attorney, however, has laid side-by-side the two temporally distinct episodes, implying, we think, that Kaiser was at Tasch's side on the eve of Doyle's testimony, showing Doyle a photograph of Anderson. If the juxtaposition of these events was intentional, sanctions would be in order. Absent additional evidence, however, we will attribute the misstatement to careless inadvertence rather than an intent to deceive.

After conducting an inquiry in which it questioned Tasch outside of the presence of the jury, the district court found that Tasch's discussion with Doyle on the eve of his testimony against Anderson did not warrant the relief Morrison sought—striking Doyle's testimony. We agree. While it surely would have been more appropriate for Tasch not to have brought up the subject of the misidentifications of Anderson at all, Tasch's comments concerning prior misidentifications did not violate the witness sequestration order—which was intended to prevent witnesses from conforming their testimony to one another—nor were they unnecessarily or impermissibly suggestive.

## D.

Anderson also challenges the sufficiency of the government's evidence to support his convictions for conspiracy to distribute cocaine and conspiracy to import marijuana. Neither challenge is persuasive.

■ As to the cocaine conspiracy conviction, the evidence against Anderson came from a single witness, Dennis McCarthy, who as we noted above, was a significant participant in the conspiracy, working closely with its kingpin, John Roubas. McCarthy testified that Anderson first worked for him in 1983 as a courier, transporting money and cocaine on a single occasion between McCarthy and Roubas. McCarthy also testified that in late 1985, Anderson was among a group of five (including Roubas, Andrini–Varga, and Pallais and Morrison, the men who piloted the cocaine from Panama) present at Gonzi Marine while cocaine was being unloaded after the successful air-drop, that Anderson took part in packaging the cocaine from shipment in sealed coffee cans to Chicago, and that he was paid for his services. This is evidence enough to allow a jury to infer that Anderson agreed to help distribute cocaine.

■ There is even more evidence supporting Anderson's conviction for conspiring to import marijuana. McCarthy placed Anderson at planning sessions for importation operations in the early summer of 1986, on one of the boats picking up a 540 kilogram shipment of marijuana in July, 1986, and at a warehouse packaging the marijuana for shipment soon thereafter. McCarthy testified that Anderson was paid for his services. McCarthy also testified that he and Anderson accompanied Roubas on a marijuana-buying junket to Jamaica in November, 1986. Anderson carried with him cash that was used to pay Roubas' supplier, and was present during negotiations for another shipment. Another minor participant in the conspiracy, Randy Friedl, testified that Anderson was a "security guy" for the drug ring. Yet another participant in the conspiracy, James Brandt, testified that Anderson was involved in another importation episode in February or March of 1987. Brandt said that Anderson was with him on the beach during marijuana pick-up operations. Brandt also testified that Anderson supervised the loading of another shipment of marijuana onto a plane in Jamaica in July or August of 1987. Similarly, Kevin Cleary, another participant-turned-government witness, testified that he had received collect calls from Anderson while Anderson was in Jamaica supervising the shipment of a load of marijuana in October of 1987. Taken together, this evidence is more than sufficient to support Anderson's conviction for conspiring to import marijuana.

## IV. JAMES DANIEL WALTON

### A.

Walton's most serious claim on appeal is that the district court violated his sixth amendment right to counsel by peremptorily dismissing his pretrial motion for substitution of counsel.

■ Walton was arraigned in Milwaukee on February 3, 1989, at which time the district court set an April 3, 1989, trial date. Walton was represented at the arraignment by a court-appointed attorney who had been assigned Walton's case the day before. On March 20, six weeks after his arraignment and two weeks before trial, Walton's attorney met with him for the first time since the arraignment. Apparently the meeting did not go well; that same day, counsel filed on Walton's behalf a motion to withdraw. Counsel represented in an affidavit that during his meeting with Walton:

the defendant became very abusive and angry and indicated that he desired a different attorney to represent his interest. [T]he defendant refused to discuss the matter any further ... and ordered the guard to remove [counsel] from the jail cell.

Walton's counsel concluded that "it would be in the defendant's best interest that new counsel be appointed." Without holding a hearing or engaging in any further inquiry, the district court denied Walton's motion, stating that:

[i]n a multidefendant case I can't allow defendants to 'fire' their attorneys, especially on the eve of trial. Mr. Walton is advised that he will go to trial, or plead out of the case, on April 3 as scheduled. No new attorney will be appointed so he should cooperate with [appointed counsel].

Walton contends on appeal that the district court erred in failing to conduct a hearing on his request for new counsel. He argues that a district court, faced with a motion for new counsel, and little knowledge of the substance of the complaint—as was indeed the case here—"has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known." *Brown v. United States*, 264 F.2d 363, 369 (D.C.Cir.1959) (Burger, J., concurring), *cert. denied*, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959). We agree.

That such an inquiry must take place follows from the very nature of the law governing attorney substitution motions. Attorney-client conflicts only justify the grant of a substitution motion when "counsel and defendant are so at odds as to prevent presentation of an adequate defense." *United States v. Hillsberg*, 812

F.2d 328, 333 (7th Cir.1987); *see also United States v. Morris,* 714 F.2d 669, 673 (7th Cir.1983) (grant of motion warranted where conflict is "so great that it resulted in a total lack of communication preventing an adequate defense"). Unless a substitution motion or the accompanying affidavit of counsel is extremely detailed—which, as here, is often not the case—a court cannot make such a determination without conducting a proper hearing at which both attorney and client testify as to the nature of their conflict. For this reason, the courts of appeals have held that " 'the district court must engage in at least some inquiry as to the reasons for the defendant's dissatisfaction with his existing attorney.' " *McMahon v. Fulcomer,* 821 F.2d 934, 942 (3d Cir.1987) (quoting *United States v. Welty,* 674 F.2d 185, 187 (3d Cir. 1982)); *see also United States v. Padilla,* 819 F.2d 952, 956 n. 1 (10th Cir.1987) ("the district court should make a formal inquiry into the defendant's reasons for dissatisfaction with present counsel when substitution of counsel is requested"); *Hillsberg,* 812 F.2d at 333 ("defendant [should be] given an opportunity to state his reasons for the [substitution] request"); *United States v. Allen,* 789 F.2d 90, 92 (1st Cir.1986) ("Where the accused voices objections to appointed counsel, the trial court should inquire into the reasons for the dissatisfaction."); *Thomas v. Wainright,* 767 F.2d 738, 741 (11th Cir.1985) (same); *Morris,* 714 F.2d at 673 ("In order to exercise its discretion properly the court must elicit from the defendant the reasons for his objections to counsel.")

As our excerpts from Walton's motion suggest, his substitution request was clearly not sufficiently detailed to allow the district court to dismiss it out of hand without further inquiry. The district court was required to make a more detailed investigation of the nature of Walton's conflict with his attorney and thereby maintain the integrity of Walton's sixth amendment right to counsel. Its failure to do so was an abuse of its discretion.

■ We must then address whether the court's error was harmless. Walton ar-

gues that in conducting this inquiry we must reverse his conviction if he was indeed entitled to have his substitution motion granted. We take a different view. Courts allow defendants to change attorneys in certain circumstances to ensure that they are afforded the effective assistance of counsel. It follows that the court's peremptory denial of Walton's motion was harmful only if it resulted in a violation of this sixth amendment right. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1964), Walton must therefore demonstrate that the performance of the attorney he was saddled with was not "within the range of competence demanded of attorneys in criminal cases," *id.* at 687, 104 S.Ct. at 2064, and that "but for" counsel's deficiencies, "the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

■ Walton contends that his attorney's performance was indeed deficient. He points first to the fact that his attorney did not meet with him to discuss the merits of his case until 13 days before trial, six weeks after his arraignment. This delay, suggests Walton, made the adequate preparation of a defense impossible—no lawyer could lay the groundwork for a defense that properly tested the conspiracy allegations against him in such a short time. Walton's principal complaint is that at his initial meeting with counsel he expressed a desire to present an alibi defense, but his attorney refused to investigate the viability of such a defense by interviewing alibi witnesses. These witnesses, Walton contends, would have testified that he was elsewhere at the times when the government's witnesses testified that he was participating in the conspiracy.

Walton's allegations are serious. Thirteen days is not a great deal of time to mount a defense in a complex multidefendant drug conspiracy. Even more troubling is the apparent refusal of Walton's attorney to investigate the possibility of an alibi defense. As disturbing as counsel's refusal is, however, we are unable to determine on the record before us whether it constitutes conduct that falls below the

sixth amendment's standards. Defense attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 690–91, 104 S.Ct. at 2066. As no investigation was made here, the question is whether the decision of Walton's counsel not to engage in one was reasonable. Such a decision would be reasonable if, during their meeting, Walton gave his attorney "reason to believe that pursuing certain investigations would be fruitless or even harmful." *Id.* at 691, 104 S.Ct. at 2066. Or, as this court has put it, counsel's failure would be excused if he could make a "rational decision that investigation is unnecessary." *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir.1984). We note that courts have often had difficulty characterizing as a rational or reasonable exercise of professional judgment counsel's *complete* failure to investigate potential alibi witnesses as was the case here. *See United States v. Debango,* 780 F.2d 81, 85 (D.C.Cir.1986); *United States v. Wolf,* 727 F.2d 656, 658 & n. 3 (7th Cir. 1984); *Crisp,* 743 F.2d at 584; *Thomas v. Lockhart,* 738 F.2d 304, 308 (8th Cir.1984). Nevertheless, without a clue as to why Walton's counsel acted as he did, and without a better understanding of the alibi defense Walton wished to present, we are unable to evaluate the adequacy of counsel's representation. A remand for an evidentiary hearing would therefore seem appropriate. *See United States v. Myers,* 892 F.2d 642, 649 (7th Cir.1990).

The government concedes the troubling nature of Walton's allegations, but argues that any error or failure on the part of counsel was not prejudicial. If the government is correct in this regard, there would be no need for a remand, as Walton would necessarily be unable to establish a sixth amendment violation.[3] We turn, then, to our prejudice inquiry. To prevail under *Strickland,* Walton must establish a "reasonable probability" that his attorney's performance affected the trial's outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Montgomery v. Petersen,* 846 F.2d 407, 414 (7th Cir.1988). Whether such a reasonable probability exists depends, of course, on the nature and strength of the government's case against him, and the nature of his attorney's failures.

Four individuals testified against Walton. Randy Friedl testified that Walton first showed up at the marina in the late fall of 1986 to work on Andrini–Varga's boats and that at that time, Walton did not join the conspiracy. Walton was, however, living in a house which doubled as a processing point for newly imported marijuana. This posed problems, according to Friedl. "Every time we were to do a move and bring [in] marijuana ... they had to get him out of there. There was a conflict." Tr. at 1385. The solution, according to Friedl, was simple. "[A]fter that they brought him into the organization being that he always knew what was going on." *Id.* The testimony of three government witnesses corroborated Friedl's statement. Brandt, Cleary, and Schmidt testified that Walton was involved in the conspiracy's importation operations between February 1987 and January 1988. Brandt and Cleary testified that Walton manned a boat during the pickup of air-dropped marijuana in Feb-

---

**3.** Walton argues that we need not engage in a prejudice inquiry, because his attorney's refusal to put on an alibi defense constituted an error of such magnitude that allows us to presume the existence of prejudice. *See United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Such a presumption, held the Court in *Cronic,* operates when "the accused is denied counsel at a critical stage of his trial" or when counsel is present but "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659, 104 S.Ct. at 2047. Walton was not denied counsel at a critical stage of the trial; the question, then, is whether his attorney's failure to pursue and present an alibi

defense amounts to a wholesale failure "to subject the prosecution's case to meaningful adversarial testing." We think not. Though he did not present Walton's alibi defense, counsel did cross-examine witnesses, impeaching them based on their prior testimony and their potential for bias. He apparently met with some success, obtaining acquittals on three substantive importation charges and a conspiracy to distribute charge levied against Walton. In this light, we cannot say that Walton's attorney failed to subject the government's case to meaningful adversarial testing. Walton must therefore demonstrate prejudice to prevail in his sixth amendment challenge.

ruary or March of 1987. Cleary also placed Walton at the warehouse where the contraband was packaged the next day. Brandt, Cleary, and Schmidt all placed Walton on a boat during a marijuana's packaging for shipment. Brandt also testified that Walton was involved in a pick-up sometime in October 1987, and Schmidt testified that Walton manned a boat in an unsuccessful air-drop operation in early December of 1987. Finally, Brandt and Cleary placed Walton on boats both at the beginning and end of January 1988 when two unsuccessful air-drops were attempted.

Walton argues that the testimony of his alibi witnesses would have proved that he was elsewhere during the drug ring's attempts to import marijuana in December 1987 and January 1988. Even if this were true, however, the government's witnesses have tied him to importation operations in the spring and summer of 1987. Walton does not suggest in his brief that his alibi witnesses would have refuted that portion of the government's case. In light of the fact that Walton's alibi witnesses would not have made a dent in a significant part of the government's formidable case, we conclude that any failure on the part of his attorney to investigate and present an alibi defense was not prejudicial.

### B.

 Under the Sentencing Guidelines, the sentences of drug offenders are tied to the quantity of controlled substance involved in the charged offense. *See* § 2E1.1. Those convicted of conspiring to violate the drug laws are criminally responsible for the total quantity of drugs in which the conspiracy they joined can reasonably be estimated to have dealt. *See* § 1B1.3; *United States v. Sergio*, 934 F.2d 875, 878 (7th Cir.1991); *Townsend*, 924 F.2d at 1389. Walton challenges the district court's computation of the amount of marijuana relevant to the determination of his sentence. He argues that the district court sentenced him on the basis of a quantity of marijuana—6,600 pounds—without having made explicit factual findings to support this figure. The transcript of the

sentencing proceedings indicates that the district court found Walton responsible for the conspiracy's importation of 6,600 pounds of marijuana, but that it indeed made no effort to detail why that quantity was chosen. Our reading of the transcript suggests that the district court found Walton's liability so evident as not to require any sort of detailed explanation. However obvious the evidence and the amount may have seemed, we agree with Walton that the district court erred in not establishing with greater specificity the quantity serving as the basis of Walton's sentence.

The evidence ties Walton to the conspiracy's activities from February 1987 to January 1988, and hence to the importation of 4400 pounds of marijuana (1400 lbs. in February, 1500 lbs. in July, and 1500 lbs. in October). The evidence also indicates that the conspirators—Walton included—attempted to import a total of 3000 pounds of marijuana in January 1988. Quantities involved in such attempts are also considered under the Guidelines in calculating base offense levels. *See* U.S.S.G. § 2D1.4 ("If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed."). Walton contends that the amounts involved in the successful smuggling runs ought not to be considered in calculating his base offense level because he was acquitted by the jury of the substantive importation charges (counts 24, 25 and 27 of the indictment) relating to these episodes. "Nothing in the guidelines," however, "prevents a judge from taking account of conduct in which the defendant engaged, whether or not an acquittal prevents the imposition of criminal penalties directly on that conduct." *United States v. Fonner*, 920 F.2d 1330, 1332 (7th Cir.1990). The jury's acquittal of Walton on the substantive importation counts means only that it did not find beyond a reasonable doubt that he engaged in the charged conduct. At sentencing, the district court could have nevertheless considered the importation episodes if it had established Walton's involvement by a (less demanding) prepon-

derance of the evidence standard appropriate in sentencing matters. *See id.* at 1333 (collecting cases); *United States v. Ebbole,* 917 F.2d 1495, 1496 (7th Cir.1990). The district court made no such finding; it did not detail which importation episodes it considered in arriving at its calculation, nor did it find that a preponderance of the evidence supported the conclusion that Walton participated in the importation activities that were the basis of the substantive charges of which he was acquitted. Such specificity was especially necessary in light of the fact that Walton argued that he joined the conspiracy months after it had begun and therefore should not be held liable for its earliest importations. We therefore vacate Walton's sentence and remand Walton's case to the district court for the appropriate factual findings and resentencing. *See, e.g., United States v. Tolson,* 760 F.Supp. 1332 (N.D.Ind.1991).

## V. SEAN FOLEY

### A.

██ Foley, too, argues on appeal that he was denied the effective assistance of counsel. His circumstances, like Walton's, give up pause.

Foley's complaint is that his attorney, Stephen Broudy, was absent for portions of his trial. On three different days, Broudy was absent for the testimony of government witnesses. The first day's absence (a total of three hours) involved the cross-examination of James Brandt, an important witness for the government who testified against Foley. On that day, Broudy missed the cross-examinations conducted by four of the attorneys representing Foley's co-defendants. (Broudy was, however, present for Brandt's direct examination, and present to cross-examine Brandt himself). On two other days Broudy was absent for 7–8 hours of the direct testimony of two government witnesses. Our review of the record indicates, however, that these latter two witnesses had no bearing at all on the government's case against Foley. Finally, Broudy was also absent when the district judge instructed the jury and when the jury returned its verdict.[4]

██ As might be expected, Foley argues that Broudy's absence amounted to ineffective assistance of counsel. He concedes, curiously, that the evidence against him is sufficiently convincing as to preclude him from establishing prejudice. Nevertheless, citing *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), he asserts that his attorney's errors were of a magnitude that give rise to a presumption of ineffectiveness that renders any prejudice inquiry unnecessary.

*Cronic* and its progeny indeed stand for the proposition that prejudice will be presumed in a sixth amendment effective assistance of counsel inquiry when "the accused is denied counsel at a critical stage of his trial." *Id.* at 659, 104 S.Ct. at 2047; *see also Strickland v. Washington,* 466 U.S. 668, 691–92, 104 S.Ct. 2052, 2066–67, 80 L.Ed.2d 674 (1984); *United States ex rel. Thomas v. O'Leary,* 856 F.2d 1011, 1018 (7th Cir.1988); *Siverson v. O'Leary,* 764 F.2d 1208, 1216 (7th Cir.1985) (prejudice inquiry "is totally inapplicable when counsel was absent from proceedings and unavailable to make any tactical judgements whatsoever"). In cases of error of such magnitude, the likelihood of prejudice

---

**4.** Each time Broudy was absent the district court asked Foley if he consented to the continuation of the trial in his attorney's absence. Each time Foley agreed. The government suggests that this "consent" obviates the need for any inquiry into the propriety of Broudy's absences. We disagree. Foley's "consent" amounted to a waiver of his right to counsel. Waivers of this sixth amendment right must be knowing and intelligent, which is to say that a defendant must "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (internal quotes omitted); *see also United States v. Belanger,* 936 F.2d 916 (7th Cir.1991); *United States v. Moya–Gomez,* 860 F.2d 706, 733 (7th Cir.1988). The district court did not conduct a *Faretta* inquiry in which he advised Foley of the potential consequences of being without an attorney; absent such a detailed inquiry, we reject the argument that Foley knowingly and intelligently consented to Broudy's absence.

is so great "that the cost of litigating [the error's] effect in a particular case is unjustified." *Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046. Similarly, the harmfulness of such a sixth amendment violation will be presumed when it is found to have "affected—and contaminated—the entire criminal proceeding." *Satterwhite v. Texas,* 486 U.S. 249, 257, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988).

Foley does injury to his own argument by both asserting that he falls under *Cronic* and yet conceding the absence of prejudice. We question how one can concede the absence of prejudice while arguing in favor of a presumption of prejudice. Technically, we suppose, one could argue that *Cronic* and *Strickland* establish an *irrebuttable* presumption of prejudice, *see Sanders v. Lane,* 861 F.2d 1033, 1038 (7th Cir.1988), that would be unaffected by Foley's admission. Putting this inconsistency aside, we do not believe—with one exception—that Broudy's concededly egregious behavior rises to the level of (or, should we say, sinks to the level of) a denial of counsel at a critical stage of the proceedings that would excuse the need for a prejudice inquiry. "A critical stage is one where potential substantial prejudice to [a] defendant's rights inheres in the particular confrontation and where counsel's abilities can help avoid that prejudice." *O'Leary,* 856 F.2d at 1014; *see also Coleman v. Alabama,* 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387 (1970).[5] As we point out above, two of Broudy's absences, while certainly not to be condoned or excused, came at inconsequential periods during the course of trial. As to Broudy's first absence (from the cross-examination of Brandt by other defense counsel), while we

do not think it inconsequential, neither do we find it to have occurred at a "critical stage." Broudy was present for Brandt's direct examination and to cross-examine Brandt himself. On the facts before us, we do not perceive the potential for "substantial" prejudice in such an absence. Our conclusion might be different if Foley and his co-defendants were presenting antagonistic defenses; if this were the case, Broudy's presence during co-counsel's cross-examination would indeed be important. Foley has not, however, advanced this argument or otherwise given us reason to believe that Broudy's absence during the cross-examination of Brandt by co-counsel was critical. Similarly, we do not find the court's *reading* of the jury instructions (as opposed, perhaps to a court's jury instruction conference with counsel) to have been a critical stage of the proceedings.

As we have previously noted, however, counsel's absence during the return of a verdict may well constitute the type of denial of counsel that excuses the need to perform *Strickland's* prejudice analysis. *See Siverson,* 764 F.2d at 1214–15, 1217. We have so held because counsel's failure to appear often deprives defendants "of the potentially valuable privilege of having the jurors polled individually on their verdicts." *Id.* at 1219. Even if Broudy's absence when the verdict was returned constituted ineffective assistance, Foley would still have to demonstrate that such error was harmful,[6] *see id.* at 1217, as such an absence does not constitute the type of sixth amendment violation that would justify bypassing entirely the harmless error inquiry. *See Satterwhite,* 486 U.S. at 257, 108 S.Ct. at 1797 (sixth amendment violation must affect and contaminate entire criminal pro-

**5.** We note that despite *Cronic's* insistence on a *presumption* of prejudice in certain cases, the definition of a prosecutions's critical stage—and hence the determination of whether a prejudice presumption applies—depends itself to some degree on a prejudice analysis. Even when engaging in a *Cronic* inquiry, then, we are never completely loosed from the factual moorings of the case before us. The notion that *Cronic* and its progeny completely obviate the need for any inquiry into the potential for prejudice is thus not entirely accurate.

**6.** We emphasize the distinction between an ineffective assistance analysis and a harmless error analysis. In the first, we determine whether a sixth amendment violation has occurred. Depending on whether *Strickland* or *Cronic* applies, prejudice may or may not be a critical component of such an analysis. In the second, we determine whether the constitutional violation is harmless. The fact that we might presume prejudice for the purposes of the former inquiry does not necessarily dictate that we do the same for the purposes of the latter.

ceeding to justify dispensing with harmless error analysis and presuming harmfulness). And where, as here, the trial court on its own initiative polled each member of the jury after the verdict was rendered, *see* Tr. at 2746–47, the absence of counsel cannot be said to have resulted in prejudice to the defendant. *See Siverson*, 764 F.2d at 1219; *United States v. Calabro*, 467 F.2d 973, 989 (2d Cir.1972). For the reasons set out above, Foley's sixth amendment challenge therefore fails. We hasten to add, however, that this conclusion in no way signifies approval of Broudy's incomplete representation of his client.

### B.

 Foley also contests the district court's calculation of his sentence. Like Walton, he argues that the district court erred in determining the amount of marijuana for which he could be held criminally responsible. (Foley was convicted of both conspiring to import and distribute marijuana.) We have no way of evaluating Foley's claim as the transcript of the sentencing hearing does not reflect that the district judge made any findings regarding the extent of Foley's involvement in the importation and distribution conspiracies. The transcript indicates only that the district court imposed a sentence of fourteen years for each conspiracy conviction. The district court's actions do not comport with 18 U.S.C. § 3553(c), which mandates that a district judge must "state in open court the reasons for its imposition of the particular sentence." "This general requirement is satisfied when a district court indicates the applicable Guidelines range, and how it was chosen." *United States v. Georgiadis*, 933 F.2d 1219, 1223 (3rd Cir.1991). *See also United States v. Johnson*, 935 F.2d 47, 51, 52 (4th Cir.1991) ("The guidelines and accompanying policy statements, coupled with Rule 32 mandate an open, on-the-

record, reason-supported determination of the principal components of a guidelines sentence, including the determination of the applicable guidelines range."). We therefore vacate Foley's sentence and remand to the district court for an explanation of the sentence imposed and any necessary factual findings.

### VI.

Defendants' remaining arguments are plainly without merit. For the reasons discussed above we affirm the convictions of each of the defendants but vacate the sentences of Anderson, Foley and Walton and remand for their resentencing consistent with this opinion.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

The majority opinion deals skillfully with the many problems presented by this difficult case and I join it in all respects save one. With respect to the appeal of James Walton, the majority states, "A remand for an evidentiary hearing would therefore seem appropriate." At 500. This seems to me to be the correct resolution of Walton's appeal, and our consideration should stop there.

Walton was held at the Metropolitan Correctional Center in Chicago before trial and his appointed counsel was from Milwaukee. Counsel visited Walton for the first time only thirteen days before trial, and there was an immediate falling out. Walton's vehement rejection of counsel was apparently precipitated by counsel's refusal to interview alibi witnesses. A prompt motion for substitution of counsel was denied without a hearing.

The majority concludes that the Sixth Amendment was not violated because Walton's proffered alibi[1] would have met some of the evidence against him but not all. I

---

**1.** The majority's finding that Walton was not prejudiced may reflect the inadequacy of the record presented to us. This inadequacy is an object lesson in the propriety of our rule for claims like Walton's: ordinarily, if based on evidence outside the trial record, claims of inef-

fective assistance of counsel may only be brought by motion under 28 U.S.C. § 2255 to vacate the conviction and sentence. *United States v. Myers*, 892 F.2d 642, 649 (1990). Mr. Walton may be able to pursue that opportunity to build a record.

think that at a hearing this thesis and its significance might have been demonstrated, but without a hearing they are speculative. Since the jury refused to convict Walton on any of the substantive importation charges, it was apparently skeptical about the sincerity of the witnesses. We do not know what testimony the jury found credible—that Walton smuggled drugs on *every* occasion the government said he did or only on some of them. A hearing is necessary to determine whether Walton was prejudiced by counsel's refusal to investigate and present his alibi.

I therefore respectfully dissent as to the matter noted.