**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Henry PALLAIS and William C. Kelly, III, Defendants–Appellants.**

**Nos. 89–1283, 89–1291.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1990.

Decided Dec. 21, 1990.

Rehearing Denied March 4, 1991.

Patricia J. Gorence, Paul Kanter, Asst. U.S. Attys., Milwaukee, Wis., for plaintiff-appellee.

Morris D. Berman, Giesen & Berman, Madison, Wis., for Pallais.

Jonathan Shapiro, Stern & Shapiro, Boston, Mass., for Kelly.

Before POSNER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

After a two-week trial, a jury convicted William Kelly and Henry Pallais of multiple counts of participating in a large drug trafficking ring. (There were a number of other defendants, but they pleaded guilty.) Hatched in a meeting in Chicago in 1983, the ring was far-flung, with many operatives and a large volume of business. Substantial quantities of cocaine and marijuana were shipped by boat or private plane from Jamaica and Colombia (sometimes via Panama) to Puerto Rico, taken by boat to Florida, and shipped by diverse means to Wisconsin for distribution. Kelly, who lived in Florida, was one of the principals of the ring; Pallais was employed as a pilot. The ring was in business for five years, until broken in 1988. The judge sentenced Kelly to 35 years in prison and Pallais to 18 years; these are no-parole terms.

The appeals present seventeen issues, not all of which, however, require discussion. One, for example, has been resolved since the filing of the parties' briefs. It is whether the quantity schedules in 21 U.S.C. § 841, which determine the severity of a defendant's sentence for trafficking in illegal drugs, define an element of the offense or merely cabin the judge's sentencing discretion. We have held that they do the latter. *United States v. Acevedo*, 891 F.2d 607, 611 (7th Cir.1989); *United States v. McNeese*, 901 F.2d 585, 600–01 (7th Cir. 1990).

Early in the trial, a juror saw the two defendants in handcuffs in the corridor outside the courtroom. The judge removed him from the jury, pursuant to a line of cases that considers it an infringement of a defendant's right to a fair trial to exhibit him to jurors handcuffed or otherwise shackled or in prison garb; the fear is that the jurors will assume that the defendant must be a criminal, and probably a dangerous one, altogether deserving of punishment. *Estelle v. Williams*, 425 U.S. 501, 504–05, 96 S.Ct. 1691, 1693–94, 48 L.Ed.2d 126 (1976); *Harrell v. Israel*, 672 F.2d 632, 635 (7th Cir.1982) (per curiam). Later another juror saw the defendants sitting in the back of the United States Marshal's car that had brought them to the court from their place of pretrial detention. Defense counsel, told about the incident by their clients, asked the judge to interview the juror to determine whether the juror's ability to render a fair verdict had been compromised by seeing the defendants in the marshal's car. The judge refused. We find no error. So far as appears, the marshal's car was unmarked and the only sign of custody was the grill between the front and rear seats. Many taxicabs have a protective grill, and for just the same reason (to protect the driver from passengers in the rear seat). There is no suggestion that the juror peered into the car or that if he had done so he would have seen the defendants in handcuffs—there is no indication they *were* in handcuffs. The defendants argue that the judge should have conducted a brief hearing to determine just what the juror saw and thought. But a judge is not required to interrupt a trial to question a juror every time defense counsel asks him to. Apart from the interruption, the juror may feel intimidated by being questioned by the judge in the privacy of the judge's chambers. There must be a reason to believe that the inquiry would be fruitful before the judge should launch it. The defendants' lawyers got the information about the juror from their clients, who could have told them whether the car was marked or their handcuffs in sight. By failing to obtain this additional information,

the lawyers failed to lay a foundation for further inquiry.

 The defendants argue that the indictment improperly charged separate marijuana and cocaine conspiracies rather than a single conspiracy to import both drugs. The government may not proliferate punishment by charging one conspiracy as multiple conspiracies. *United States v. Cerro*, 775 F.2d 908, 913 (7th Cir.1985); *United States v. Powell*, 894 F.2d 895, 897–98 (7th Cir.1990). The defendants point out correctly that the original scheme hatched in 1983 was to import both marijuana and cocaine. But as the years passed, the scheme bifurcated. Marijuana and cocaine are different drugs in terms of sources, channels of distribution, methods of shipment and processing, and customers. Fourteen of the original defendants were involved with one of the drugs but not the other. Had they all been joined in one giant conspiracy, they would have howled. It is true that our two defendants, the defendants who stood trial, were involved in both phases of the operation. But you can have overlapping conspiracies. A legitimate business enterprise can have many divisions, programs, activities, contracts; they are not all a single agreement just because a handful of top officers is in charge of the entire firm and some of the lower-level employees may work on more than one program or contract. The same is true with a criminal enterprise. The jury properly found two conspiracies.

 The defendants complain about the use in evidence against them of coconspirators' out-of-court statements that (they claim) were not in furtherance of the conspiracy. Typical was a statement reporting Pallais' failure to drop a package of cocaine from his airplane in the proper drop zone and a statement that Kelly was known as "Big Guy" in the drug ring. To understand the objection you must understand the curious reasoning by which coconspirator statements are admissible (in the federal courts, pursuant to Fed.R.Evid. 801(d)(2)(E)) notwithstanding the hearsay rule, provided they are made in the course of, and further, the conspiracy. Ordinarily,

if Witness X testifies that Y (who, let us say, to make the example as stark as possible, has since died) told him that defendant K was called "Big Guy," the testimony would be inadmissible to prove that K *was* "Big Guy," because Y would not be available for cross-examination. But if Y is a coconspirator of K, then any statement made by Y in the furtherance of their conspiracy is attributed to K, on the "theory" (called a "fiction" in the Note of the Advisory Committee on Proposed Rule 801) that each member of a conspiracy is the agent of each of the other conspirators whenever he is acting—including speaking—to promote the conspiracy (hence the requirement that the statement be in furtherance of the conspiracy). *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir.1926) (L. Hand, J.). Y's statement becomes a statement by K, and as such is an admission by a party; such admissions are not classified as hearsay statements. Fed.R.Evid. 801(d)(2).

The reasoning is impeccable as a matter of contract law; an agent can bind his principal by what he says; but what has this to do with the purpose of the rules of evidence, which, so far as relevant here, is to keep out unreliable evidence? The reliability of Y's out-of-court statement is not enhanced by the fact that he was a member of a conspiracy with K, about whom the statement was made. Nor is it apparent why from the standpoint of evidentiary reliability it should make a difference whether the statement was in furtherance of the conspiracy. Against this type of criticism it has been argued that coconspirators' statements "are reliable in the same sense that contracts or negotiations among legitimate business partners usually portray accurately the affairs of those involved." *United States v. Molt*, 772 F.2d 366, 369 (7th Cir.1985). But it is the character of these transactions, not the existence of an agency relationship, that makes the statements of the participants reliable; from the standpoint of evidentiary reliability it would make no difference whether the negotiation was between two partners of the same firm, or between two firms. Nor is the rule limited to contracts and negotiations; among the statements whose admis-

sion was upheld in *Molt* on the basis of the coconspirator exception were "conversations concerning planning *or review* of the drug ring's exploits." *Id.* (emphasis added).

A different and cleaner approach would be to cut loose from the agency issue and ask instead whether the particular hearsay statement was sufficiently reliable to be considered by the jury; and that is the tendency of the Federal Rules of Evidence, with their broad catch-all provision. Fed.R. Evid. 803(24). But the admissibility of coconspirators' statements made in furtherance of the conspiracy is a settled rule, now codified in the Federal Rules of Evidence and upheld against constitutional challenge in *Bourjaily v. United States*, 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987), however odd and artificial it might seem as an original matter; so we need only consider whether the statements in question were made in furtherance of the conspiracy.

■ It could be argued that *any* statement by a conspirator, made while he is a member of the conspiracy, that concerns the conspiracy and has some informational content is in furtherance of it. The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname such as "Big Guy" is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible. *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir.1988). Conspiracy is a serious business, and talk about it among or by the conspirators should not be presumed to be unrelated to the accomplishment of the conspiracy's goals.

But if it is idle chatter, it is not admissible. The concern with reliability that an-

imates other rules of evidence reasserts itself here. Mere chitchat, casual admissions of culpability, and other noise and static in the information stream are not admissible. *United States v. Doerr*, 886 F.2d 944, 951–52 (7th Cir.1989); *Garlington v. O'Leary*, 879 F.2d 277, 283–84 (7th Cir.1989). They are said not to be in furtherance of the conspiracy, but the real point is that they are insufficiently reliable to be considered by a jury. And however all this may be, the distinction set forth in the cases was respected by the judge's evidentiary rulings.

Pallais has a meritorious hearsay complaint unrelated to conspirators' statements. The main witness against him was an undercover agent named Lincoln, who penetrated the organization. He gave much damaging testimony against Pallais and among other things testified to a meeting he had had with Pallais in Panama at which Pallais described the time, place, and plane in which he would be taking off the next morning to pick up a shipment of cocaine in Colombia. Lincoln actually saw the plane take off, but he could not see who was in it. At trial the prosecutor asked him: "did the Panamanian authorities tell you who had signed out or who had listed that they were flying this particular Cherokee airplane out of Panama?" Lincoln answered "yes," whereupon Pallais' lawyer objected on the ground of hearsay. The judge overruled the objection and Lincoln then stated, "They advised that Henry Pallais, the best pronunciation I had at the time, and Mr. Morrison who was the other pilot."

■ The government concedes that this was rank hearsay, falling within none of the many exceptions, not even the catch-all. But it claims that Pallais waived his right to challenge the admission of the evidence on appeal, because he failed to make a proper objection at trial. The government's reasoning is intricate. The prosecutor's question called for a yes or no answer, and neither would have been hearsay, because Lincoln was a perfectly competent witness to testify to whatever the Panamanian authorities told him. The only

objection would be to his being the vehicle for the Panamanian authorities' identifying Pallais as the pilot, and if all he testified was they had said "yes" or that they had said "no," there would be no such identification. Hence Pallais' objection was properly overruled. Then with no question pending, Lincoln volunteered the identity that the Panamanians had given him, and the prosecutor should not be blamed because a witness blurts out an answer to a question that has not been asked.

This is shallow casuistry, unworthy of the Department of Justice. We hope not to see it repeated in this circuit. Since the only thing anyone cared about was the pilot's identity, it would not have been responsive for Lincoln to have answered yes and stopped. A complete answer was "yes, Pallais and Morrison." People do not normally construe questions literally. They try to figure out what the questioner wants and, if they are in a cooperating mood, answer accordingly. The questioner obviously wanted the identity of the pilots and that is what Lincoln gave her. Defense counsel saw what was coming and interposed his objection before Lincoln reached the damaging part of his answer. The objection was timely and preserved the point for appeal. Fed.R.Evid. 103(a)(1).

■ The overruling of the objection was error, since the question called for hearsay that fitted none of the exceptions. But it was harmless error. The most damaging part of Lincoln's testimony was not that the Panamanians had told him that Pallais was in the plane, but that *Pallais* had told him that he would be in the plane—and much else besides that established beyond a reasonable doubt Pallais' participation in the conspiracy as a pilot and a "kicker" (one who kicks bales of marijuana or packages of cocaine out of the airplane's door over the drop zone).

The remaining issues relate to defendant Kelly alone. Three arise from the circumstances of his arrest and subsequent detention. (1) In the course of its investigation of the drug ring, the government identified several properties with which Kelly was associated, and concluded that he probably lived at one of them, a row house at 1407 S.W. 24th Court, Fort Lauderdale. A warrant to arrest him was issued. Equipped with it, agents drove by 1407 S.W. 24th Court looking for signs that Kelly was there. One day they saw, parked outside 1415 S.W. 24th Court just a few doors away from 1407, a pick-up truck that they knew was registered to Kelly and that he had been seen driving on previous occasions. More agents were summoned to the scene, to surround the area; there was also a SWAT team, just in case; the police presence was formidable. One of the agents knocked on the door of 1407 and asked the woman who opened it whether Kelly lived there. She said he lived next door, which the agents took to mean 1415, a house with a detached garage above which was an apartment with an exterior staircase. As the agents ran toward the house they saw a woman—who turned out to be Kelly's wife—run down the stairs and toward the house, presumably to warn Kelly, since the area was now swarming with police. They intercepted her, and she said she had not seen her husband since the morning. The agents were convinced he was inside. They insisted that she let them into the house, which she did, and eventually they found Kelly hiding in the crawl space. A search of his person revealed a list of coconspirators' telephone numbers. The list was used in evidence against him at the trial. No search warrant had ever been issued and Kelly argues that the entry into 1415 without a search warrant violated his rights under the Fourth Amendment, making the list seized from his person as a sequel to that entry inadmissible.

(2) The government presented testimony that Kelly had been in hiding when he was arrested, the theory being that that was the behavior of a guilty man. He objects to this evidence too.

(3) The day after the arrest, one of the agents went back to 1415 to return personal property of Kelly's that had been seized when he was arrested; he was in jail, bail having been denied after a hearing before a magistrate. Kelly's wife and son asked

the agent whether the charges against Kelly were serious. The agent said they were but that Kelly might be able to help himself by telling the government the whereabouts of one of the ringleaders. While the agent was talking to Kelly's family, Kelly called and after talking to his family and finding out from them that the agent wanted his help asked that the agent be put on the line. The agent asked him about the ringleader's whereabouts. Apparently Kelly gave him no useful information, but in the course of their conversation he said, "You know, I used to do all the work but I have been semi-retired for the last year and a half two years." The government used this statement against him at the trial, pointing out that semi-retired meant semi-employed and was therefore an admission of guilt. Kelly objects to the agent's being permitted to testify to this admission.

■ Taking the objections in reverse order, we see no impropriety in allowing Kelly's admission into evidence even though his right to the assistance of counsel had attached at the time of the conversation with the agent, so that *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), forbade the agent to interrogate him. The government's argument that the interrogation really was noncustodial, because Kelly, although in jail, was not in the agent's physical presence and could have terminated the interrogation simply by hanging up, is misconceived; custodial status is a condition of *Miranda*, not of *Massiah*. Nevertheless the claim must fail. The government did not use the fruits of an interrogation. Not only was it Kelly's idea to speak to the agent in the first place, but the incriminating statement that he volunteered was not in response to the agent's questions, which concerned the whereabouts of a third party. The statement would have been related to that issue if offered to explain why Kelly could not identify that party's whereabouts. The statement could on that theory be construed as a response to the questions. But Kelly does not argue this, so we must assume that the statement was unrelated to the interrogation. *Massiah* does not

forbid the government to use a statement that a defendant has volunteered in a conversation that he has initiated. *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986); *United States v. Peoples*, 748 F.2d 934, 936–37 (4th Cir.1984) (per curiam).

■ We are not troubled by the use of the circumstances of Kelly's arrest to show consciousness of guilt. It is true that flight can be ambiguous evidence of guilt. Maybe when Kelly saw the officers and the back-up SWAT team and all the rest he thought they were after him for unpaid parking tickets. Then his behavior would not be probative of his participation in drug trafficking. But this is hardly a plausible hypothesis. The ring was crumbling. Pallais had been arrested just three days before. When arrested Kelly was found with the list of coconspirators' phone numbers, indicating active participation to the last and supplying a motive directly related to the charges against him for his having tried to elude arrest.

But was the list admissible? It was only if the entry into 1415 was lawful. The house at that address (as distinct from the garage and the apartment above the garage) was being renovated by Kelly with the help of workmen whom he had hired. Kelly and his wife were living in the apartment above the garage. The entire property—the house and garage and the lot on which they were sited—was owned by Kelly's grown children but they had never lived there. The Kellys had bought the property, had promptly deeded it to their children, had begun renovating it for them, and until the renovation was complete were living in the garage apartment.

■ A police officer with an arrest warrant can enter the suspect's residence to execute the warrant if there is reason to believe he will be found there; the officer does not need a search warrant. *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). But it is otherwise if the entry is into someone else's residence. In *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68

L.Ed.2d 38 (1981), the police entered a third party's residence where they thought they would find the person whom they had a warrant to arrest. While searching the residence for this person, they discovered cocaine, which they tried to use in evidence against the owner of the residence. The Supreme Court held that such use would violate the owner's Fourth Amendment rights, since otherwise, "armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." *Id.* at 215, 101 S.Ct. at 1649. Our case may seem to lie smack in the middle between these two precedents. The agents entered a house owned by Kelly's children in order to execute a warrant for his arrest, but the evidence they seized in the course of making the arrest was for use against him, not against the children, the owners.

■■■ The government makes it seem an easy case. Either the house (undergoing renovation) at 1415 was Kelly's residence or it was not. If it was, then *Payton* governs and the entry was proper. If it was not, then Kelly has no standing to challenge the agents' entry into it, any more than he would have standing to challenge the agents' entry into a gazebo on a neighbor's property had he fled there when he saw the agents approach. The neighbor would have standing in our hypothetical case; so might the children in our case; but the children are not parties.

To escape this dilemma Kelly argues, first, that the house at 1415 was not his residence, since he was living not there but above the garage, and therefore that *Payton* does not apply; but, second, that he had a sufficient expectation of privacy in the house to have standing to object to an unauthorized entry. We need not decide whether the second point has merit; the first does not. Kelly's residence was the lot with the house and the garage on it. Where he happened to sleep within this complex is a detail unrelated to the purposes of the Fourth Amendment. Just as a homeowner may move into a spare bedroom when the master bedroom is undergoing renovation, so a person who has extra rooms above his garage may move into

them when his main house is undergoing renovation. He does not by this temporary rearrangement of living quarters abandon his main residence, of which the master bedroom is part. Our case differs in that, so far as appears, the Kellys did not intend to move into the house when it was renovated; it was for their children. Still, it was part of the property, of the homestead, in which the Kellys were living. To bolster his claim of standing, Kelly points out that he stored food and tools in the house being renovated and occasionally used the toilet there. Whatever it does for standing, this evidence only strengthens the inference that the house was part of a complex of buildings constituting Kelly's residence. Under *Payton*, police armed with an arrest warrant can search the entire residence of the person named in the warrant in order to execute it—he cannot defeat the search by hiding in the garage. That is in effect what happened here—except that Kelly was living in the garage and fled to the house, a reversal of the usual circumstances that does not persuade us that the search went beyond the residence.

■■■ Two issues remain to be discussed. In closing argument the prosecutor made the standard misstep and commented on Kelly's failure to take the stand. Kelly's lawyer had remarked in his closing argument that the government had failed to call certain persons who, one might have thought, could have given the best evidence about the defendants' activities. On rebuttal, the prosecutor replied: "Mr. Brown [Kelly's lawyer] said, hey, where are these other witnesses, you know, he didn't call Mr. Kelly to the stand. That was his decision." We rebuke prosecutors repeatedly for commenting on a defendant's failure to take the stand, a practice held in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), to violate the constitutional right of a defendant to not be forced to incriminate himself. *Ten years* ago we were commenting on a "sense of futility from persistent disregard of prior admonitions." *United States v. Rodriguez*, 627 F.2d 110, 112 (7th Cir.1980). These rebukes seem to have little effect, no doubt because of the harmless error rule, which in this as in many other cases precludes an

effective remedy for prosecutorial misconduct. *Dortch v. O'Leary,* 863 F.2d 1337, 1343–45 (7th Cir.1988); but see *Williams v. Lane,* 826 F.2d 654, 664–68 (7th Cir.1987), where we affirmed the grant of habeas corpus. The expansive code of constitutional criminal procedure that the Supreme Court has created in the name of the Constitution is like the grapes of Tantalus, since the equally expansive harmless error rule in most cases prevents a criminal defendant from obtaining any benefit from the code. The evidence against Kelly was overwhelming. The comment on his failure to take the stand could not have made the difference between acquittal and conviction. The error was harmless beyond a reasonable doubt.

 The last issue relates to the use of a conviction, nine years before this trial, to increase Kelly's sentence. Such "enhancement" is expressly authorized in drug cases by 21 U.S.C. § 851. Kelly claimed that the previous conviction had been obtained in violation of his constitutional right to counsel. The government riposted with section 851(e), which forbids a defendant to challenge the validity of a conviction used to enhance his present sentence if the conviction is more than five years old. Kelly argues that this statute of limitations is unconstitutional. The district judge did not address the constitutional issue, but instead skirted it by finding that the old conviction was valid, the circumstances showing convincingly that Kelly had knowingly waived his right to counsel in that proceeding. We agree with this assessment and thus can duck the constitutional issue—serious though it is. The Supreme Court has held that the constitutional right to the assistance of counsel forbids the government to base an increase in punishment on a conviction in a proceeding in which the defendant was denied the assistance of counsel. *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); see also *Baldasar v. Illinois,* 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980) (per curiam). This would seem to imply that the defendant must have an opportunity to show that he was indeed denied the assistance of counsel in that proceeding. Section 851(e) allows the

government to use convictions obtained in violation of the right to counsel to imprison a defendant for many additional years.

That is one way to look at the problem but another is that the statute merely establishes an orderly method for determining the constitutionality of prior convictions. A defendant who fears the possible future use of his conviction against him had better challenge the validity of the conviction within five years. That is time enough for a direct appeal and a postconviction proceeding, and no more should be needed to establish the validity of the conviction with adequate reliability. Against this it can be argued that at least in a case like this, where the conviction in question occurred years before Congress enacted section 851(e), the defendant can hardly be charged with foreseeing the need to challenge a seemingly minor conviction (Kelly just was fined) merely in order to avoid the bar of the statute of limitations should that conviction ever be used to enhance a future punishment.

We leave the decision of these interesting questions to a case in which they must be answered. They need not be here. The previous conviction was valid.

AFFIRMED.