The decisions of the district court are AFFIRMED.

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William DiDOMENICO, et al., Defendants–Appellants.**

Nos. 93–1134, 93–1135, 93–1136, 93–1604, 93–2008, 93–3434, 93–3435, 93–3513, 93–3514, 93–3515, 93–3516, 94–1831 and 94–3341.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1995.

Decided March 1, 1996.

Rehearing and Suggestions for Rehearing En Banc Denied May 23, 1996.

Barry Rand Elden, Chief of Appeals, Mitchell A. Mars (argued), Office of United States Attorney, Criminal Appellate Division, Chicago, IL, for United States.

Allan A. Ackerman (argued), Chicago, IL, for William DiDomenico in No. 93–1134.

Allan A. Ackerman (argued), Chicago, IL, for Harry Aleman in No. 93–1135.

Alexander M. Salerno (argued), Berwyn, IL, Jed Stone, Chicago, IL, for Paul Spano in No. 93–1136.

Dennis A. Berkson, Allan Ackerman (argued), Henry Samuels, Chicago, IL, Robert A. Stevenson, Palos Park, IL, for Robert Covone in No. 93–1604.

Thomas J. Royce, Allan Ackerman (argued), Chicago, IL, for James Nicholas in No. 93–2008.

Allan A. Ackerman, Chicago, IL, for Salvatore DeLaurentis in No. 93–3434.

Allan A. Ackerman (argued), Chicago, IL, for Salvatore DeLaurentis in No. 93–3435.

Allan A. Ackerman, Chicago, IL, Patrick A. Tuite (argued), Arnstein & Lehr, Chicago, IL, for Rocco E. Infelise in No. 93–3513.

Allan A. Ackerman, Chicago, IL, Patrick A. Tuite, Arnstein & Lehr, Chicago, IL, George N. Leighton (argued), Neal & Associates, Chicago, IL, for Louis Marino in No. 93–3514.

Robert A. Novelle, Serpico, Novelle & Navigato, Chicago, IL, Allan A. Ackerman, Chicago, IL, Patrick A. Tuite (argued), Arnstein & Lehr, Chicago, IL, for Robert Bellavia in No. 93–3515.

Robert A. Stevenson, Palos Park, IL, Allan Ackerman (argued), Chicago, IL, for Michael Sarno in No. 93–3516.

Allan A. Ackerman (argued), Chicago, IL, Patrick A. Tuite, Arnstein & Lehr, Chicago, IL, for Rocco E. Infelise, Salvatore DeLaurentis, Louis Marino, Robert Bellavia, Harry Aleman in No. 94–1831.

Patrick A. Tuite (argued), Arnstein & Lehr, Chicago, IL, for Rocco E. Infelise in No. 94–3341.

Sharon G. Kramer, Chicago, IL, for Salvatore DeLaurentis, Harry Aleman in No. 94–3341.

George N. Leighton, Neal & Associates, Chicago, IL, for Louis Marino in No. 94–3341.

Robert A. Novelle, Serpico, Novelle & Navigato, Chicago, IL, for Robert Bellavia in No. 94–3341.

James R. Meltreger, Onesto, Giglio, Meltreger & Associates, Chicago, IL, for Michael Sarno in No. 94–3341.

Alexander M. Salerno, Berwyn, IL, for Paul Spano in No. 94–3341.

Robert A. Stevenson, Palos Park, IL, for Robert Covone in No. 94–3341.

Thomas J. Royce, Chicago, IL, for James Nicholas in No. 94–3341.

Before POSNER, Chief Judge, and CUDAHY and COFFEY, Circuit Judges.

POSNER, Chief Judge.

The Chicago Outfit (the "Outfit," the "Mob," the "Mafia")—the criminal enterprise whose most notorious boss was Al Capone—

operates through "street crews." The twenty defendants in this mainly RICO case that charges predicate acts of extortion, bribery, murder, and other offenses were members of the Ferriola Street Crew, named after its boss from 1979 to his death in 1989, Joseph Ferriola. Ferriola was succeeded by defendant Infelise. The Ferriola Street Crew engaged in the usual "Mob" activities, in particular the protection racket (the collection of "street tax" from brothels, gambling enterprises, and other illegal businesses), loan sharking, and bookmaking, with bribery of police, judges, prosecutors, and other public officials, subornation of jurors, and the occasional murder thrown in to protect and enforce its reign of terror. The focus of the prosecution was on the street crew's efforts to collect street tax from "independent" bookmakers, which is to say bookmakers not affiliated with the "Mob," in the suburbs north of Chicago, primarily during the 1980s. These efforts included the murder of a bookmaker named Hal Smith. The evidence of the defendants' participation in these activities was overwhelming, except that the evidence of their participation in the murder depended critically on the testimony of a turncoat member of the street crew, William Jahoda. Smith had angrily refused a demand relayed to him from defendant DeLaurentis to pay street tax, saying "fuck the little guinea." Infelise directed Jahoda to lure Smith to Jahoda's home, which he did, arriving in Smith's car. Jahoda told Smith to enter the house through the garage, while Jahoda pretended to pick up his mail. Shortly afterward, through the open door to the kitchen, Jahoda saw Smith lying dazed but conscious on the kitchen floor. Infelise drove Jahoda back to the tavern where he had met Smith and told him to burn his clothes. When Jahoda returned home later that night, he found that the kitchen floor had recently been mopped up. Infelise called and told him to look for Smith's cigar and glasses, which the murderers thought they might have left there. Jahoda did not find the items. Smith's body was found a few days later in the trunk of his car. He had been tortured and then strangled.

The defendants were tried together and found guilty of most of the counts of the indictment and received long prison sentences which in the case of some of the defendants, given their age, are the equivalent of life in prison. Their appeals, which we have consolidated, present sixteen separate grounds. We shall confine our discussion to those that have arguable merit, disregarding such frivolous ones as that the judge could not sentence the defendants to terms of years that were (because of the defendants' age) the practical equivalent of life in prison without a jury recommendation, as required by 18 U.S.C. § 34 as it read when they were sentenced. Section 34 applies only to convictions for crimes punished by the chapter of the federal criminal code in which the section appears (mainly arson resulting in the destruction of aircraft or motor vehicles), and none of the defendants was convicted of any such crimes. It didn't help, though, that in response the government, overlooking *United States v. Prevatte,* 66 F.3d 840, 843–44 (7th Cir.1995), argued that a term of years, however long, and however old the defendants are, is not within the scope of section 34. We held the contrary in *Prevatte* and in *United States v. Martin,* 63 F.3d 1422, 1432–34 (7th Cir.1995).

The most dramatic issue and the one pressed hardest by the defendants arises from the bugging of a room in the Metropolitan Correctional Center, the federal jail in Chicago. The room had been set aside for the use of the defendants, who were being detained in the jail awaiting trial, in meeting with their lawyers. Someone made a tape recording of a conversation between one of the defendants and his lawyer and sent the tape to the lawyer. The defendants argue that the district judge should have conducted an evidentiary hearing to determine the extent of the bugging and whether it had given the prosecution information about defense strategy that the prosecution had used to undermine the defense at trial.

The lawyer gave the tape to the government, which began an investigation to determine who had bugged the room. The FBI interviewed almost 150 people, including the defendants, their lawyers, the prosecutors, and employees of the jail. The report of the investigation, which was submitted in camera

to the district judge (and which we have read as well), indicated that the investigation had been totally inconclusive. Although visitors to the MCC are supposed to be screened for tape recorders, security was lax during 1991, when the bugging incident occurred, as we know from the El Rukns cases. See, e.g., *United States v. Boyd*, 55 F.3d 239 (7th Cir.1995). A tape recorder may have been smuggled in to one of the defendants by a visitor, or even carried in by one of the defendants' lawyers. A guard at the MCC might have been in the pay of the defendants (there was evidence at trial that at least one federal officer was in the pay of the Ferriola Street Crew) and made the tape in an effort to embarrass the prosecution. Or, as the defendants conjecture, the prosecution itself may have bugged the meeting room to find out what discreditable information the defendants knew about Jahoda, a key prosecution witness. Of course the prosecution would not have sent the tape of its illegal bugging to the lawyer for one of the defendants, but maybe an MCC guard sympathetic to the "Mob" found the tape and mailed it to the lawyer.

█ The government argues that the defendants did not lay a foundation for an evidentiary hearing on the matter because they presented no evidence that the bugging altered the result at trial—no evidence that the prosecution was privy to the bugging or, if it was, used the information gleaned from it to undermine the defense or if it did caused innocent people to be convicted of heinous crimes. We do not consider this a sound argument. It pushes the notion of harmless or nonprejudicial error too far. The principle that an acquittal or a new trial is not a proper remedy for governmental misconduct, that the defendant must show that the misconduct may have caused the jury to convict him, is sound but like most legal principles cannot be maintained without qualification. Otherwise the prosecution could send a defendant to prison without any judicial process whatsoever and if he complained defend by showing that had the defendant been tried with assistance of counsel and all the other trimmings of modern criminal procedure he would surely have been convicted and sentenced to a term of years at least as long as the prosecution proposes to hold him. The counterprinciple that defeats this result is that denial of the right to counsel (not the right to competent counsel, but the more basic right to *some* counsel) or of any other fundamental rights of criminal defendants (such as the right to an impartial judge or to trial by jury) is reversible error even if not shown to be prejudicial—even if shown to be completely harmless. E.g., *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977); *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927).

█ We put to the government at oral argument the following example. The government adopts and announces a policy of taping *all* conversations between criminal defendants and their lawyers. It does not turn the tapes over to the prosecutors. It merely stores them in the National Archives. The government's lawyer took the position that none of the defendants could complain about such conduct because none could be harmed by it, provided the prosecutors never got their hands on the tapes. We are inclined to disagree, although for a reason that will become apparent shortly we need not attempt to resolve the issue definitively. The hypothetical practice that we have described would, because of its pervasiveness and publicity, greatly undermine the freedom of communication between defendants and their lawyers and with it the efficacy of the right to counsel, because knowledge that a permanent record was being made of the conversations between the defendants and their lawyers would make the defendants reluctant to make candid disclosures. (Totalitarian-style continuous surveillance must surely be a great inhibitor of communication.) And yet it would be impossible in any given case to show that the outcome had been changed by the practice. *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir.1995); *United States v. Perry*, 857 F.2d 1346, 1349–50 (9th Cir.1988). At the other extreme are cases of ad hoc governmental intrusion into the relation between a criminal defendant and his lawyer,

falling far short of continuous surveillance. In such cases harm to the defense must be shown because the bare fact of the intrusion does not create a high probability that communication between lawyer and client or between client and lawyer was disrupted. *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *Weatherford v. Bursey,* 429 U.S. 545, 554 n. 4, 558, 97 S.Ct. 837, 843 n. 4, 845, 51 L.Ed.2d 30 (1977); *United States v. Castor,* 937 F.2d 293, 297–98 (7th Cir.1991); *Clark v. Wood,* 823 F.2d 1241, 1249–50 (8th Cir.1987); *Sinclair v. Schriber,* 916 F.2d 1109, 1113 (6th Cir.1990).

■ Our case may seem closer to the first pole than to the second. The bugging was discovered before the trial and from then on the defendants and their lawyers must have wondered whether their conversations were being overheard, even though the district judge promptly authorized the defendants to meet with counsel outside of the jail; and conceivably this fear might have prevented effective communication between client and lawyer, emptying the right to the assistance of counsel of much of its meaning. Cf. *United States v. Cronic,* 466 U.S. 648, 659–60, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984); *United States v. Berkowitz,* 927 F.2d 1376, 1381 (7th Cir.1991). "Free two way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful." *United States v. Levy,* 577 F.2d 200, 209 (3d Cir.1978); see also *Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 1336, 47 L.Ed.2d 592 (1976). The defendants do not argue, however, that the effect of the natural anxiety of themselves and their lawyers concerning the confidentiality of their conversations was sufficient to warrant a new trial or perhaps—since it is not obvious how a new trial would dissipate the anxiety—even the dismissal of the indictments with prejudice. Such an argument would be unlikely to succeed when so far as appears the bugging incident was completely isolated (and isolated intrusions into the attorney-client relation are, as we have seen, not reversible error per se) and the bug may have been planted by one of the defendants. In any event the argument is not made. All the defendants argue for is an evidentiary

hearing to get to the bottom of the matter. In light of the report of the FBI investigation it is unlikely that such a hearing would get us nearer to the heart of the mystery. But the defendants are understandably reluctant to defer to a report they have not seen compiled by an agency that they suspect or at least affect to suspect of being responsible for the very crime that it was investigating.

The defendants' request is a reasonable one but it comes too late. The district judge offered them an evidentiary hearing, directed the government to furnish them with a list of all the employees of the MCC who had had access to the meeting room, and gave the defendants' lawyers subpoena power to compel the presence of witnesses at the hearing. The hearing was scheduled for September 23, 1991, a week before the scheduled opening of the trial. Shortly before the hearing was to take place, the defendants requested more time to complete their investigation. The hearing was repeatedly postponed at the defendants' request. During the delay the government submitted affidavits from all the members of the prosecution team, attesting their lack of complicity in the bugging. Finally on July 16, 1992, almost ten months after the original date set for the hearing and four months after the jury had returned its verdict, the defendants moved for an evidentiary hearing. After reviewing the FBI report, and noting that despite a lengthy investigation the defendants had come up with no evidence to suggest that the government was implicated in the bugging, the judge denied the motion. At no time during this entire period—which did not end until May 23, 1994, when the judge denied the defendants' last request for access to the FBI report—did the defendants submit the tape to the judge.

■ In these circumstances we cannot say that the judge abused her discretion in declining to order an evidentiary hearing. A critical consideration is the government's affidavits. Although evidentiary hearings in criminal cases are not governed by the Federal Rules of Civil Procedure, the provisions of those rules relating to summary judgment are applicable by analogy. *United States v.*

*Ritter,* 752 F.2d 435, 439 (9th Cir.1985); cf. *United States v. Randle,* 966 F.2d 1209, 1212 (7th Cir.1992); *Castillo v. United States,* 34 F.3d 443, 445–46 (7th Cir.1994). In opposing the evidentiary hearing sought by the defendants the government was in a position analogous to that of a movant for summary judgment who argues that no genuine issue of material fact exists and therefore that summary judgment should be granted. A fundamental principle of summary judgment that we think ought to be applied in cases such as this in which the issue is whether to hold an evidentiary hearing is that if the proponent supports his motion with affidavits, the opponent must counter the motion with his own affidavits (or equivalent materials, which is to say materials having the quality of evidence). By submitting affidavits the government shifted to the defendants the burden of submitting counteraffidavits that would show there was an issue that only an evidentiary hearing could resolve. The defendants did not take up the burden although they had many months to do so.

Against this it can be argued, in accordance with our earlier discussion, that even if the prosecution team was not complicit in the bugging, the defendants' right to counsel may have been infringed. It is one federal government after all. If the director of the MCC ordered the bugging, there would be a serious issue of the infringement of that right even if the fruits of the bugging were not turned over to the prosecutors. And on that issue the affidavits did not bear at all. But throughout these proceedings, up to and including the appeal, the defendants have accepted that they must show, if not prejudice to their defense, if not likelihood of acquittal had the bugging not taken place, at least potential prejudice and for that they would have to show that the prosecution received, directly or indirectly, valuable information from the bugging. This the prosecution denied by affidavit—denied that it had received *any* information from the bugging—and the inability of the defendants, though granted ample time and resources, to come up with counteraffidavits dooms their challenge to the denial of an evidentiary hearing. Had the defendants not sought to postpone the hearing first offered them by the district judge, they would have had their hearing. They gambled on having a better hearing if given more time to investigate, but the gamble failed when the investigation turned up nothing, and they must be held to their tactical decision.

In short, the defense could have (1) argued that no showing of prejudice was required or (2) presented some evidence of prejudice. By doing neither, the defense forfeited their claim to an evidentiary hearing. We do not think that we are being overtechnical in so concluding, especially since, given the inconclusiveness of the FBI's investigation, the likelihood that an evidentiary hearing would get to the bottom of the bugging incident is remote.

■ The defendants raise two issues concerning the jury. The first is whether the judge abused her discretion in empaneling an anonymous jury, that is, in refusing to reveal the names and addresses of the jurors to the parties. A juror's name and address are information potentially valuable to a party in deciding whether to challenge a juror either for cause or by the use of a peremptory challenge. The juror might turn out to be related to a party or a witness (yet not disclose this on voir dire) or to live in a neighborhood whose residents have demographic characteristics predictive of their likely response to the issues in the case. There is skepticism in some quarters about the ability of lawyers, even when aided by pricey consultants, to pick favorable jurors; but so long as we have challenges for cause and peremptory challenges the objection to anonymous jurors that it deprives the lawyers of information essential to their exercise of a valued procedural right cannot be rated as negligible. But we think the district judge acted within her discretion (see *United States v. Crockett,* 979 F.2d 1204, 1215 (7th Cir.1992); *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991)) in deeming the right overridden in this case by the fear of jurors to be identified to the Chicago Outfit and by the danger that they might be bribed. Intimidation in general, and bribery of public officers connected with the criminal justice system (and jurors of course are ad hoc public officers of that system—are in fact lay

judges) in particular, are specialties of the Outfit. This is not a case, like *United States v. Vario*, 943 F.2d 236, 241 (2d Cir.1991), in which the defendants are rumored to have "Mob" connections. The defendants *are* the "Mob." We add that the anonymity of the jury hurt the prosecution as well as the defense, since the prosecution too has and frequently exercises the right to challenge jurors for cause or to exercise peremptory challenges. The judge's ruling may not have altered the balance of advantages between prosecution and defense.

■ The other jury issue relates to an inconsistency in the verdict regarding defendant DeLaurentis. He was accused of participation in the conspiracy to murder the bookmaker Hal Smith in two different counts of the indictment. The jury found him not guilty of that participation in one of the counts (Count One) but guilty in the other (Count Eight). The poll of the jury did not illuminate the discrepancy, as each juror indicated that the verdict was correct. On the day after the verdict was rendered, however, one of the jurors stated on a local news program that the jury had *not* voted DeLaurentis guilty of conspiracy to murder in Count Eight. This led the judge to interview the jurors, a week later, in the presence of counsel. The judge ascertained that the jury had indeed intended to acquit DeLaurentis of both counts of conspiracy to commit murder. But she refused the defendants' request that she ask the jurors whether they had made any other mistakes in filling in the verdict form.

■ Again we think the judge acted within the scope of her discretionary authority. There was no indication of any other mistake in the verdict. The interviews took place a week after the verdict and the jurors no longer had their notes of what had gone on in the jury room. It is not clear what line of questioning might have identified another error on the verdict form. Although not permitted to inquire into the deliberative process itself—the discussion or thoughts or votes of the jurors, Fed.R.Evid. 606(b)—the judge is permitted to inquire whether the verdict represents the actual decision of the jury. *Continental Casualty Co. v. Howard,*

775 F.2d 876, 885 (7th Cir.1985); *Plummer v. Springfield Terminal Ry.,* 5 F.3d 1 (1st Cir. 1993). But the inquiry must be conducted with due regard for the policy that underlies Rule 606(b). Jurors are conscripts, taken away from their jobs or other activities sometimes for months at a time (the trial in this case lasted four and a half months) and enlisted in the justice system for meager pay, here to try dangerous men who are members of a gang capable of retaliation against jurors. To embarrass or harass these jurors by protracted questioning about their deliberations would be a disservice to the jury system, which can hardly thrive if jurors are sullen and resentful as a result of being abused by judges and lawyers. The line is drawn between determining whether the verdict is true in the sense of an accurate statement of the jury's decision and rational in the sense of intelligent and deliberated. *Id.* at 4; *Continental Casualty Co. v. Howard, supra,* 775 F.2d at 885–86; *Karl v. Burlington Northern R.R.,* 880 F.2d 68, 74 (8th Cir. 1989). The defendants ask us to cross the line. There was no reason to believe that the verdict contained other clerical errors. A march through the verdict in search of them would inevitably have become an inquest on the character of the deliberations.

The two jury issues raised by the defendants thus turn out to be linked by their common potential for imperiling the jury system by undermining the protection of jurors from threats to their safety and dignity.

■ There is an issue relating to the instructions. After the trial in this case the Supreme Court, in *United States v. Gaudin,* — U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), held that the issue of materiality, in a prosecution under 18 U.S.C. § 1001 for making false statements to federal agencies, is one of fact, not law, and is therefore for the jury to determine. In our case the judge said to the jury, with respect to the charges of violations of the Internal Revenue Code made in the indictment against several of the defendants, "I instruct you as a matter of law that understatement of 'total income' is a material matter." The provisions of the Internal Revenue Code under which these defendants were charged, however, 26 U.S.C.

§§ 7206(1) and (2), punish false or fraudulent statements with respect to *material* facts, thus bringing the principle of *Gaudin* into play. These defendants would therefore be entitled to a new trial on the tax counts had they raised the issue in the district court. Since they did not, they can prevail only if the error in the instructions was a plain error, and for the reasons stated in the concurring opinion in *Gaudin,* —— U.S. at ——, 115 S.Ct. at 2322, and in our recent opinion in *United States v. Ross,* 77 F.3d 1525, 1538–41 (7th Cir.1996), we believe that it was not.

■■■■ Jahoda testified to a number of conversations that he had had with defendant Bellavia in 1989 concerning the murder of Smith five years earlier. For example, in a plain allusion to the murder, Bellavia told Jahoda, "You know, when them things happen, I just, when they're done, they're done.... I blank 'em out.... Sometimes you got to get it out in the open and you feel better, and you can put it to bed once and for all. You know, it's done and gone, forget about it." In the same vein he told Jahoda, "Forget about it. You know, it's gone.... [Y]ou never do something with ... anybody you're going to worry about in the future. Forget about it. You know, it's gone. The day it was over, it was over. It's forgotten. That was the end of it." These statements, though hearsay, were admitted into evidence against the other defendants as having been made in furtherance of the conspiracy. Fed. R.Evid. 801(d)(2)(E). Against Bellavia himself, they were uncontroversially admissible as the admissions of a party. Fed.R.Evid. 801(d)(2)(A). But the principle that allows the admission of conspirator X to be treated as the admission of defendant conspirator Y, usable against Y as the admission of a party provided that the statement is made in furtherance of the conspiracy, disquiets those who believe that the concept of conspiracy gives prosecutors too much power. The rationalization for the principle is that conspirators are each others' agents (and therefore principals), and the principal is bound by the agent's words and deeds, provided they are within the scope of the agency, so that an admission by one is an admission by all and can be used against all as "their" admission.

■■■ This translation of commercial principles of agency into the law of evidence is one of the less impressive examples of what Coke called the "artificial reason" of the law. The concern behind the hearsay principle is with the reliability of evidence rather than with the facilitation of enterprise—and anyway the law of conspiracy is designed to discourage rather than to facilitate enterprise. Because a statement to be admissible as the statement of a party need not have been against interest when made (or at any time for that matter), *Huff v. White Motor Corp.,* 609 F.2d 286, 292 and n. 7 (7th Cir. 1979); 2 *McCormick on Evidence* § 254, p. 143 (4th ed., John William Strong gen'l editor, 1992), the admissibility of such a statement cannot convincingly be grounded in the presumed trustworthiness of a statement that is against the utterer's self-interest to give. E.g., 2 *id.,* p. 141; *United States v. Pallais,* 921 F.2d 684, 687–88 (7th Cir.1990). The standard justification of its admissibility is a kind of estoppel or waiver theory, that a party should be entitled to rely on his opponent's statements. E.g., *United States v. Chappell,* 698 F.2d 308, 312 (7th Cir.1983); 2 *McCormick on Evidence, supra,* p. 141. It has, it seems to us, rather little force as applied to the admissibility of a coconspirator's statement. *United States v. Gil,* 604 F.2d 546, 549 (7th Cir.1979); Comment, "Reason and the Rules: Personal Knowledge and Coconspirator Hearsay," 135 *U.Pa. L.Rev.* 1265, 1272–73 (1987). About all that can be said in favor of the rule is that since the statements of agents of legitimate enterprises are imputed to the enterprise through the operation of the law of agency on the party-admission rule, illegitimate enterprises, such as criminal conspiracies, should not receive more favorable treatment.

■■■ Whatever the justification for the rule—and there may be none—its dependence on agency principles makes the scope of the conspiracy critical. And a conspiracy, and a conspiracy to conceal an earlier, completed conspiracy, are two different conspiracies, like two different firms, and statements made in furtherance of the second, the cover-

**304**

up conspiracy, are therefore not admissible in evidence to demonstrate participation in or the acts of the first conspiracy. *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949); *United States v. Masters,* 924 F.2d 1362, 1368 (7th Cir.1991); *United States v. Xheka,* 704 F.2d 974, 985 (7th Cir.1983). But this is not such a case. Hal Smith was killed as part of the overall conspiracy to extract street tax from the independent bookmakers in the area worked by the street crew. The conspiracy was still going on when Bellavia, in an effort to prevent its unraveling, made his reassuring statements to Jahoda. Statements designed to prevent a conspiracy from collapsing are not to be equated to statements designed to cover up a finished conspiracy. In the first case unlike the second there is only one conspiracy; the statements are made in an effort to shore it up and keep it going; they are therefore admissible against the conspirators. *United States v. Marin,* 7 F.3d 679, 690 (7th Cir.1993); *Garlington v. O'Leary,* 879 F.2d 277, 284 (7th Cir.1989); *United States v. Mason,* 658 F.2d 1263, 1270 (9th Cir.1981).

The remaining issues that require discussion all relate to sentencing. Defendants Bellavia, Infelise, and Marino object vigorously to the fact that the judge in determining their sentences found that their conduct had included a conspiracy (nested within the overall RICO conspiracy) to murder Hal Smith, even though the jury either acquitted or hung on the counts that charged these defendants with participation in that conspiracy. The issue of their participation was before the jury, they argue, and in finding guilt where the jury did not the judge usurped the jury's function. This is wrong. The jury was asked to decide whether there was proof of the defendants' guilt beyond a reasonable doubt, whereas the issue in sentencing is whether the defendants' guilt is shown by a preponderance of the evidence, a lower standard, so that the failure of the proof to satisfy the first standard doesn't show that it fails to satisfy the second. *United States v. Jones,* 54 F.3d 1285, 1294 (7th Cir.1995); *United States v. Chandler,* 12 F.3d 1427, 1434–35 (7th Cir.1994). Otherwise you couldn't have a tort suit for wrongful death as the sequel of the defendant's acquittal, which of course you can.

We acknowledge the growing concern that defendants in the federal courts are being sentenced for crimes that they were adjudged guilty of only under the civil standard. *United States v. Ebbole,* 917 F.2d 1495, 1496 (7th Cir.1990). The government could not persuade the jury to convict these three defendants of conspiracy to murder Hal Smith but they were sentenced for the crime anyway. The principle exploits the traditional indifference of reviewing courts to the length of a sentence within the bounds fixed by the statute under which the defendant was convicted. Although two members of this court have recently expressed tentative support for requiring, as a matter of the federal common law of criminal procedure, proof by clear and convincing evidence of facts presented at the sentencing hearing in justification of a markedly higher sentence than the facts found at trial, *United States v. Rodriguez,* 73 F.3d 161, 162 (7th Cir.1996) (dissent from denial of rehearing en banc), that is neither the present view of a majority of the judges nor a position urged by the defendants in this case.

DeLaurentis was sentenced to 222 months in prison, although his base offense level after various adjustments other than the one in issue was only 33, for which the guidelines range is 135 to 168 months. The judge raised the sentence far above that range by making an upward departure on the basis of the large number of crimes committed by DeLaurentis that had been counted neither in the base offense level nor in his criminal history (he had, in fact, no significant criminal history). The reason for the departure was that the base offense level is "topped off" at five "units" (which in this case equate to crimes). U.S.S.G. § 3D1.4; *United States v. Dawson,* 1 F.3d 457, 459 n. 2 (7th Cir.1993). DeLaurentis had actually committed at least 22 crimes, of which 6 would get him to the 5–unit top. Since all 22 crimes were committed in furtherance of the RICO conspiracy, they were conduct related to the offense of conviction rather than (as in *United States v. Dawson* ) being a part of the

defendant's criminal history. Judge Williams divided the number of uncounted crimes by 5 in order to yield additional base levels, resulting in the punishment bonus of which the defendant complains. We do not understand the defendant to be arguing that the divisor was too small. The choice of the divisor is an exercise of judgment that an appellate court will not disturb unless it exceeds the bounds of reason. *United States v. Chase,* 894 F.2d 488, 491–92 (1st Cir.1990); but cf. *United States v. Pearson,* 911 F.2d 186, 190–91 (9th Cir.1990).

The argument, rather, is that the grouping provision (section 3D1.4) is limited to convicted crimes (or to stipulations of crimes). U.S.S.G. ch. 3, pt. D, introductory comment; *United States v. Dawson, supra,* 1 F.3d at 463; *United States v. White,* 888 F.2d 490, 496 (7th Cir.1989); *United States v. Paccione,* 949 F.2d 1183, 1205 (2d Cir.1991); *United States v. Blanco,* 888 F.2d 907, 909–10 (1st Cir.1989). Unconvicted, unstipulated crimes may not be used for a departure based on that section. *United States v. Dawson, supra,* 1 F.3d at 463. Only 13 of DeLaurentis's 22 crimes were ones of which he had been convicted. So his punishment bonus under section 3D1.4 should have been only 2 at most (13 − 6 = 7, 7 ÷ 4 ≈ 2), rather than the 3 that the judge gave him. There may be other grounds for an upward departure, see U.S.S.G. § 5K2.0; *United States v. Dawson, supra,* 1 F.3d at 465; *United States v. Uccio,* 940 F.2d 753, 759 (2d Cir.1991), but that is something for Judge Williams to consider when resentencing DeLaurentis.

■ The last issue we need discuss concerns the denial of defendant Sarno's motion to vacate his plea agreement on the ground that the district judge gave him a much heavier sentence than the agreement contemplated. The agreement specified a guidelines range of 46 to 57 months and in fact he was sentenced to 78 months. But there was no violation of the agreement, which stated that the guideline calculations in it "are preliminary in nature and subject to revision by the Court." The calculations turned out to be in error and were corrected by the judge. Sarno explicitly assumed the risk of such an error, and has only himself or possibly his lawyer to blame. He could have refused to sign the plea agreement unless it specified that it could be rescinded if the judge went outside the guidelines range set forth in it. Fed.R.Crim.P. 11(e)(1)(C), (e)(4); *Carnine v. United States,* 974 F.2d 924, 930–31 and n. 8 (7th Cir.1992); *United States v. Ellison,* 798 F.2d 1102, 1105 (7th Cir.1986).

DeLaurentis is entitled to be resentenced. With this exception, the judgments are affirmed.